# INTERSTATE COMMERCE COMMISSION *v.* ALABAMA MIDLAND RAILWAY COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 203.　Argued March 12, 15, 16, 1897. — Decided November 8, 1897.

*Cincinnati, New Orleans & Texas Pacific Railway v. Interstate Commerce Commission*, 162 U. S. 184, and *Interstate Commerce Commission v. Cincinnati, New Orleans & Texas Pacific Railway Company*, 167 U. S. 479, adhered to, to the points that Congress has not conferred upon the Interstate Commerce Commission the legislative power of prescribing rates, either maximum, or minimum, or absolute; and that, as it did not give the express power to the Commission, it did not intend to secure the same result indirectly by empowering that tribunal, after having determined what, in reference to the past, were reasonable and just rates, to obtain from the courts a peremptory order that in the future the railroad companies should follow the rates thus determined to have been in the past reasonable and just. "

Competition is one of the most obvious and effective circumstances that make the conditions, under which a long and short haul is performed, substantially dissimilar, and as such must have been in the contempla-

tion of Congress in the passage of the act to regulate commerce. This
is no longer an open question in this court.

The conclusion which the court reached in *Interstate Commerce Commission
v. Baltimore & Ohio Railroad*, 145 U. S. 263, and *Wight* v. *United States*,
167 U. S. 512, that in applying the provisions of §§ 3, 4 of the Interstate
Commerce Act of February 4, 1887, c. 104, 24 Stat. 379, making it un-
lawful for common carriers to make or give any undue or unreasonable
preference or advantage to any particular person or locality, or to charge
or receive any greater compensation in the aggregate for the transporta-
tion of passengers or of like kind of property, under substantially simi-
lar circumstances and conditions, for a shorter than for a longer distance
over the same line in the same direction, competition which affects rates
is one of the matters to be considered, is not applicable to the second
section of the act.

The purpose of the second section of that act is to enforce equality between
shippers over the same line, and to prohibit any rebate or other device
by which two shippers, shipping over the same line, the same distance,
under the same circumstances of carriage, are compelled to pay different
prices therefor, and it was held in *Wight* v. *United States*, 167 U. S. 512,
that the phrase "under substantially similar circumstances and condi-
tions," as used in the second section, refers to the matter of carriage,
and does not include competition between rival routes.

This view is not open to the criticism that different meanings are attributed
to the same words when found in different sections of the act; for, as
the purposes of the several sections are different, the phrase under con-
sideration must be read, in the second section, as restricted to the case
of shippers over the same road, thus leaving no room for the operation
of competition, but in the other sections, which cover the entire tract of
interstate and foreign commerce, a meaning must be given to the phrase
wide enough to include all the facts that have a legitimate bearing on
the situation — among which is the fact of competition when it affects
rates.

The mere fact of competition, no matter what its character or extent, does
not necessarily relieve the carrier from the restraints of the third and
fourth sections; but these sections are not so stringent and imperative
as to exclude in all cases the matter of competition from consideration
in determining the questions of "undue or unreasonable preference or
advantage," or what are "substantially similar circumstances and con-
ditions." The competition may in some cases be such, as, having due
regard to. the interests of the public and of the carrier, ought justly to
have effect upon the rates, and in such cases there is no absolute rule
which prevents the Commission or the courts from taking that matter
into consideration.

The conclusions of the court on this branch of the case are: (1) that com-
petition between rival routes is one of the matters which may lawfully
be considered in making rates for interstate commerce; and (2) that
substantial dissimilarity of circumstances and conditions may justify

common carriers in charging greater compensation for the transportation of like kinds of property for a shorter than for a longer distance over the same line, in such commerce.

Whether, in particular instances, there has been an undue or unreasonable prejudice or preference, or whether the circumstances and conditions of the carriage have been substantially similar or otherwise, are questions of fact depending on the matters proved in each case.

The Circuit Court had jurisdiction to review the finding of the Interstate Commerce Commission on these questions of fact, giving effect to those findings as *prima facie* evidence of the matters therein stated; and this court is not convinced that the courts below erred in their estimate of the evidence, and perceives no error in the principles of law on which they proceeded in its application.

ON the 27th day of June, 1892, the Board of Trade of Troy, Alabama, filed a complaint before the Interstate Commerce Commission at Washington, D. C., against the Alabama Midland Railway Company and the Georgia Central Railroad Company and their connections, claiming that in the rates charged for transportation of property by the railroad companies mentioned and their connecting lines there was a discrimination against the town of Troy, in violation of the terms and provisions of the Interstate Commerce Act of Congress of 1887.

The general ground of complaint was, that Troy being in active competition for business with Montgomery, the defendant lines of railway unjustly discriminated in their rates against the former, and gave the latter an undue preference or advantage in respect to certain commodities and classes of traffic. The specific charges insisted on at the hearing, and to which the testimony related, were:

1. That the Alabama Midland Railway and the defendant roads forming lines with it from Baltimore, New York and the East to Troy and Montgomery charged and collected a higher rate of shipments of class goods from those cities to Troy than on such shipments *through Troy* to Montgomery; the latter being the longer distance point by fifty-two miles.

2. That the Alabama Midland Railway and Georgia Central Railroad and their connections unjustly discriminated against Troy and in favor of Montgomery in charging and collecting $3.22 per ton to Troy on phosphate rock shipped

from the South Carolina and Florida fields and only $3.00 per ton on such shipments to Montgomery, the longer distance point by both of said roads; and that all phosphate rock carried from said fields to Montgomery over the road of the Alabama Midland had to be hauled through Troy.

3. That the rates on cotton, as established by said two roads and their connections, on shipments to the Atlantic seaports, Brunswick, Savannah and Charleston, unjustly discriminated against Troy and in favor of Montgomery, in that the rate per hundred pounds from Troy is forty-seven cents, and that from Montgomery, the longer distance point, is only forty cents, and that such shipments from Montgomery over the road of the Alabama Midland had to pass through Troy.

4. That on shipments for export from Montgomery and other points, within the so called "jurisdiction" of the Southern Railway and Steamship Association to the Atlantic seaports, Brunswick, Savannah, Charleston, West Point and Norfolk, a lower rate was charged than the regular published tariff rate to such seaports, and that Montgomery and such other points were allowed by the rules of said association to ship through to Liverpool via any of these seaports at the lowest through rates on the day of shipment, which might be less than the sum of the regular published rail rate and the ocean rate via the port of shipment; that this reduction was taken from the published tariff rail rate to the port of shipment; that, this privilege being denied to Troy, was an unjust discrimination against that town in favor of Montgomery and such other favored cities, and that it was also a discrimination against shipments which terminate at such seaports in favor of shipments for export.

5. That Troy was unjustly discriminated against in being charged on shipments of cotton via Montgomery to New Orleans the full local rate to Montgomery by both the Alabama Midland and Georgia Central.

6. That the rates on "class" goods from Western and Northwestern points, established by the defendants forming lines from those points to Troy, were relatively unjust and dis-

criminatory as against Troy when compared with the rates over such lines to Montgomery and Columbus.

The Commission, having heard this complaint on the evidence theretofore taken, ordered, on the 15th day of August, 1893, the roads participating in the traffic involved in this case "to cease and desist" from charging, demanding, collecting or receiving any greater compensation in the aggregate for services rendered in such transportation than is specified, as follows, to wit:

1. On class goods shipped from Louisville, Kentucky; Saint Louis, Missouri, or Cincinnati, Ohio, to Troy aforesaid, no higher rate of charge than is now charged and collected on such shipments to Columbus, Georgia, and Eufaula, Alabama.

2. On shipments of cotton from Troy aforesaid through Montgomery, Alabama, to New Orleans, Louisiana, no higher rate of charge than fifty cents per hundred pounds.

3. On shipments of cotton from Troy aforesaid for export through the Atlantic seaports, to wit, Brunswick, Savannah, Charleston, West Point or Norfolk, no higher rate of charge to these ports than is charged and collected on such shipments from Montgomery aforesaid.

4. On shipments of cotton from Troy aforesaid to the ports of Brunswick, Savannah or Charleston, no higher rate of charge than is charged and collected on such shipments from Montgomery aforesaid through Troy to said ports.

5. On shipments of class goods from New York, Baltimore or other Northeastern points to Troy aforesaid, no higher rate of charge than is charged and collected on such shipments through Troy to Montgomery aforesaid.

6. On shipments of phosphate rock from South Carolina and Florida fields to Troy aforesaid, no higher rate of charge than is charged and collected on such shipments through Troy to Montgomery aforesaid.

The defendants having failed to heed these orders, the Commission thereupon filed this bill of complaint in the Circuit Court of the United States for the Middle District of Alabama, in equity, to compel obedience to the same. On the hearing in said court the bill of complaint was dismissed, and

complainant, the Interstate Commerce Commission, appealed the cause to the United States Circuit Court of Appeals for the Fifth Judicial Circuit, at New Orleans, Louisiana. And, thereupon, in said last-named court, on the 2d day of June, 1896, the decree of the said Circuit Court of the United States for the Middle District of Alabama was in all things duly affirmed; and from this judgment and decree the appellant appealed to this court.

*Mr. L. A. Shaver* and *Mr. Assistant Attorney General Whitney* for appellant.

*Mr. George F. Edmunds*, on behalf of the appellant, on the question of the jurisdictional power of the Interstate Commerce Commission to make the order it did in this case, that the charge exacted by the carriers in respect of the particular goods in question should not exceed a certain named sum which the Commission, upon complaint, answers, issues, proofs and hearing, found to be reasonable and just, filed the following brief.

I. It is submitted with respectful confidence that the interstate commerce law is in all its civil aspects a remedial one.

At the time of its passage the railway carriers were the absolute and irresponsible masters of all interstate commerce. The several States, in trying to break up, or at least to mitigate, the unjust tyranny of these great corporations and combinations that held the largest part of the intercourse of the people in their grasp (and which in many instances undertook to control political as well as commercial affairs), found themselves baffled, and practically defeated in their efforts by the national constitutional provision that only Congress could regulate interstate commerce. In this state of affairs, and to redress such enormous grievances, the Interstate Commerce Act was passed for the intended benefit of the whole body of the citizens of the Republic having a common grievance and a common interest in the vast commercial intercourse between all the States. This legislation was, therefore, in the very highest sense, and to the last degree, remedial.

II. Being thus remedial, the statute ought to be construed liberally to the attainment of the ends in view. Instead of being given the narrowest possible application and construction, it should, it is humbly submitted, be applied and construed by the judiciary in the largest latitude fairly consistent with its language. It ought not to be frittered away by the refinements of criticism, or made ineffectual because it does not possess all the inclusive and exclusive qualities of a plea in abatement, and may not be "certain to a certain intent in every particular." It is, perhaps, questionable taste for the bar to cite authority for this proposition, but it may be permitted to refer to a few of the vast number of the authorities on the subject. *Wilkinson* v. *Leland,* 2 Pet. 627; *Silver* v. *Ladd,* 7 Wall. 219; *Beaston* v. *Farmers' Bank,* 12 Pet. 102; *United States* v. *Bank of North Carolina,* 6 Pet. 29; *Bank of United States* v. *Lee,* 13 Pet. 107; Broom's Legal Maxims, 5th Am. ed. (3d London ed.) 80.

III. But the contention on the other side is that, while the Commission has power to decide what shall not be done, it has no power in the very same case to do complete justice by declaring what shall be done by the carriers in the given matter. We may well quote here the language of Broom's Legal Maxims : " Again, in construing an act of Parliament, it is a settled rule of construction that cases out of the letter of the statute, yet within the same mischief or cause of the making, thereafter shall be within the remedy thereby provided; and, accordingly, it is laid down that for the sure and true interpretation of all statutes (be they penal or beneficial, restrictive or enlarging of the common law) four things must be considered : (1st) What was the common law before the making of the act; (2d) What was the mischief for which the common law did not provide; (3d) What remedy has been appointed by the legislature for such mischief; and (4th) The true reason of the remedy. And then the duty of the judges is to put such a construction upon the statute as shall suppress the mischief and advance the remedy — to suppress the subtle inventions and evasions for continuing the mischief *pro privato commodo,* and to add force and life to the cure and

remedy according to the true intent of the makers of the act, *pro bono publico.* In expounding remedial laws, then, the courts will extend the remedy so far as the words will admit." It is submitted that the words of the statute in question do not require the application of the foregoing rules, — being too plain for their application. If they are not, then the rule should be applied.

IV. What, then, is the statute? At the risk of reiteration, I quote the crucial parts of some of the sections bearing on the subject of this brief. Act of February 4, 1887, c. 104, 24 Stat. 379.

" SEC. 1. . . . All charges made for any services rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, or for the receiving, delivering, storage or handling of such property, shall be reasonable and just; and every unjust and unreasonable charge for such service is prohibited and declared to be unlawful.

" SEC. 2. That if any common carrier subject to the provisions of this act shall, directly or indirectly, by any special rate, rebate, drawback or other device, charge, demand, collect or receive from any person or persons a greater or less compensation for any service rendered or to be rendered in the transportation of passengers or property, subject to the provisions of this act, than it charges, demands, collects or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic, and under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful.

" SEC. 3. That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic to any undue

or unreasonable prejudice or disadvantage in any respect whatsoever. . . .

"SEC. 4. That it shall be unlawful for any common carrier subject to the provisions of this act to charge or receive any greater compensation in the aggregate for the transportation of passengers or of like kind of property under substantially similar circumstances and conditions for a shorter than a longer distance over the same line, in the same direction. . . ."

SECS. 6 and 7 control the regulation of through rates, and provide against devices to break up continuous transportation, and for a general control of the Commission over that subject.

SEC. 9 provides that persons claiming to be damaged in respect of the matters embraced in the acts may complain to the Commission.

SEC. 11 establishes the Commission, and secures to it a nonpartisan character and a freedom from private interest or bias.

"SEC. 12 [as amended by the act of March 2, 1889, c. 382, 25 Stat. 855]: That the Commission hereby created shall have authority to inquire into the management of the business of all common carriers subject to the provisions of this act, and shall keep itself informed as to the manner and method in which the same is conducted; and shall have the right to obtain from such common carriers full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created; and the Commission is hereby authorized and required to execute and enforce the provisions of this act; . . . and for the purposes of this act the Commission shall have power to require by subpœna the attendance and testimony of witnesses, and the production of all books, papers, tariffs, contracts, agreements and documents relating to any matter under investigation. . . ."

"SEC. 13. That any person, firm, corporation or association, or any mercantile, agricultural or manufacturing society, or any body politic or municipal organization complaining of anything done or omitted to be done by any common carrier subject to the provisions of this act in contravention to the provisions thereof, may apply to said Commission by petition,

which shall briefly state the facts; whereupon a statement of the charges thus made shall be forwarded by the Commission to such common carrier, who shall be called upon to satisfy the complaint, or to answer the same in writing within a reasonable time, to be specified by the Commission. If such common carrier, within the time specified, shall make reparation for the injury alleged to have been done, said carrier shall be relieved of liability to the complainant only for the particular violation of law thus complained of. If such carrier shall not satisfy the complaint within the time specified, or there shall appear to be any reasonable ground for investigating said complaint, it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper. . . .

"Sec. 14. That whenever an investigation shall be made by said Commission, it shall be its duty to make a report in writing in respect thereto, which shall include the findings of fact upon which the conclusions of the Commission are based, together with its recommendation as to what reparation, if any, should be made by the common carrier to any party or parties who may be found to have been injured; and such findings so made shall thereafter, in all judicial proceedings, be deemed *prima facie* evidence as to each and every fact found. . . .

"Sec. 15. That if in any case in which an investigation shall be made by said Commission it shall be made to appear to the satisfaction of the Commission, either by the testimony of witnesses or other evidence, that anything has been done or omitted to be done in violation of the provisions of this act, or of any law cognizable by said Commission, by any common carrier, or that any injury or damage. has been sustained by the party or parties complaining, or by other parties aggrieved in consequence of any such violation, it shall be the duty of the Commission to forthwith cause a copy of its report in respect thereto to be delivered to such common carrier, together with a notice to said common carrier to cease and desist from such violation, or to make reparation for the injury so found to have been done, or both. . . .

" SEC. 16. That whenever any common carrier as defined in and subject to the provisions of this act, shall violate, or refuse or neglect to obey or perform any lawful order or requirement of the Commission created by this act, . . . it shall be lawful for the Commission, or for any company or person interested in such order or requirement, to apply in a summary way, by petition to the Circuit Court of the United States, sitting in equity, . . . alleging such violation or disobedience, as the case may be; and the court shall have power to hear and determine the matter, on such short notice to the common carrier complained of as the court shall deem reasonable; . . . and said court shall proceed to hear and determine the matter speedily as a court of equity . . . in such manner as to do justice in the premises; and to this end such court shall have power, if it think fit, to direct and prosecute in such mode, and by such persons as it may appoint, all such inquiries as the court may think needful to enable it to form a just judgment in the matter of such petition. . . ."

These sections, by general, comprehensive and specific language (only short, possibly, of the inclusive and exclusive strictness and fulness required in pleas in abatement at common law), place within the jurisdictional power and duty of the Interstate Commerce Commission the investigation, hearing and determination of all questions of dispute between the public and its component citizens and localities and the carriers. There is no limitation of the clear phrases of these various sections. The duty of the carrier is set forth in all its aspects, both of affirmative duty and of prohibition. The first section requires that " all charges shall be reasonable and just." The second section prohibits special personal favoritism by secret devices. The third section prohibits preferences between persons or localities and kinds of traffic. The fourth section prohibits charging more for a shorter than for a longer distance. The twelfth section provides that the Commission shall have authority to "inquire into the management of the business of all common carriers," and that " the Commission is hereby authorized and required to execute and enforce the

provisions of this act." There is no part of it that the statute does not expressly require the Commission to cause to be completely executed. The method of this execution is pointed out by the prescribed modes of procedure provided for in sections 13, 14, 15 and 16. And all this to be done on due application, under due procedure of notice, evidence and hearing of all the parties. How, then, can it be said by the most hypercritical refiner that the Commission has no jurisdiction to decide, for instance, what is "reasonable and just" as provided in section 1? Has the Commission only the power to repeat the words of the statute, and say to the carrier proved to be guilty of extortion, "You must desist from extortion, and be reasonable and just"? Would not that be a palpable mockery of either administrative or judicial justice?

If the statute had contained only the first and twelfth sections with the procedure sections, could this court doubt the power of the Commission to decide the matter, and require the very conduct on the part of the carrier that the Commission had found to be "reasonable and just?" To hold otherwise would be to ignore and flout the plainest possible use of language, if the statute be within the competence of Congress to pass.

But the rightful power of Congress to enact the law is not disputed. That the legislative department of any government, state or national, has power to regulate the conduct of any full or *quasi* public business, is too obvious for discussion. State legislatures, in respect of their internal commerce and polity, possess, and have always exercised, the power of controlling all such business through agents (by whatever names they may be called), to whom is deputed the execution of the sovereign will according to the principles and rules laid down by the legislative power. The innumerable instances of this need not be cited. Indeed, government could not be, and it never has been, carried on in any other way.

Again: section 2 prohibits the unjust discrimination between persons, *i.e.*, between the traffic that citizens may be engaged in, or between citizens engaged in the same traffic. The Commission is, by the proper methods of procedure, to

" enforce " this provision. Is the power of the Commission exhausted in saying to the discriminating carrier, " You shall not discriminate," and stop there? Must it not say, if it does its duty in enforcing the act and redressing the grievances found to exist, that it will enforce the law by deciding what the nature and degree of the discrimination is, and by requiring that such degree of discrimination shall be effaced altogether by affirmative conduct of equality, or by a charge of no more than the ascertained rightful sum, to the parties aggrieved?

Without referring in detail to the other provisions of the statute above quoted, it is safe to say that the plain purpose and clear, comprehensive language of the act show that the whole and all of the duties and obligations of the carrier to its customers and toward localities, etc., are to be enforced by the Commission; not a part of them, not a half of any of them, but all and every part of all of them. It is like algebra, in which neither side of the equation can possibly be considered or worked without the other. A complaint may be filed before the Commission (as in this case) alleging that the carrier ought not to charge for a described service more than the just and reasonable sum of fifty cents the hundred pounds, while, in fact, it is exacting one dollar the hundred pounds. Suppose the carrier appears and confesses that fifty cents per hundred is a reasonable and just price and that it does exact one dollar, but insists that the Commission has no jurisdiction to require the confessed reasonable charge to be made, and that it only has jurisdiction to require the cessation of the one dollar exaction, thus leaving the carrier to continue to plunder its customers of forty-nine cents per hundred with absolute impunity, as far as the Commission is concerned, until a new complaint shall have been instituted and the forty-nine cent charge again declared to be unreasonable. That this is shocking to all our natural sense of justice no one can dispute. Why, then, should the broad, comprehensive, and specific language of the statute be " cabined, cribbed, confined " to produce such a state of the law? The citation from Broom may be well remembered in this connection.

The statute certainly requires the carrier to refrain from

exacting more than a reasonable price (section 1); to refrain from drawbacks, rebates, etc., and all other unjust discriminations (section 2); to refrain from giving preferences or unequal advantages to persons or localities (section 3); to refrain from exacting more for a short than for a long haul (section 4); to refrain from all devices to break up continuous passage from road to road (section 7). I repeat in this connection that section 12 provides that the Commission shall have authority to "inquire into the management of the business," etc., and to obtain "full and complete information necessary to perform the duties and carry out the objects for which it was created." And I repeat the inquiry, what were the duties and objects for which it was created? The same section answers the question in terms so clear that neither cavil nor sophistry can confuse or obscure them.

V. But it is said that the Commission is not a judicial body, and cannot exercise judicial powers. Granted in the strict sense of the terms; but, in every civilized country, administrative officers have always lawfully exercised many powers, in every department of government, which are in their nature judicial; for every power which involves the exercise of judgment, opinion and decision is of that nature. Such are the powers exercised by the Secretary of the Interior as to many land questions; the Secretary of the Treasury and some of his subordinates, as to customs, etc.; the various Commissions that have existed from time to time for nearly a century to settle land claims; and many others.

That Congress had the power to establish interstate "rates" in the largest sense of the word cannot be doubted. And that it had the power to establish a Commission to do the same thing is, it is submitted, equally clear. It is assumed, for the purpose of this case, that it did neither in the sense to which I am now referring. It adopted a policy short of this, and provided clear descriptions and requirements concerning the duties of the carriers in all the aspects that touch their conduct toward their patrons and toward the localities and sections of the country; and established the Commission to execute and enforce all these provisions — not a part of them,

and not a part of any one of them; not negatively merely, but affirmatively and fully, to the end that real conformity by the carrier to the requirements of the act should be obtained, and as the act declares, obtained speedily, by procedure formal and ceremonious, in which all parties in interest were to be heard ; and it provided for a decision of the particular question and the particular grievance thus brought to the attention of the Commission and examined by it; and in case of refusal to obey, the act provided for a suit to be brought in a judicial court of " equity," which ˌcourt is required " to hear and determine the matter speedily as a court of equity," with all that the phrase implies.   The Commission is to inquire into " anything done or omitted to be done " by any common carrier subject to the provisions of the act in contravention to the provisions thereof; and it authorized the Commission to require the carrier to " satisfy the complaint," or answer; and then, after hearing, to require the carrier " to cease and desist from such violation, or to make reparation, or both."   How can this be done short of a decision upon the whole matter?   To again illustrate, let it be supposed that the sole complaint was that the carrier was exacting double what was just and reasonable for a particular service, and that this, on due notice to both sides, was found to be true.   This would be a palpable violation of the act.   But the Commission is authorized to require the carrier to cease and desist from doing that very wrong.   Does the carrier do so unless and until he reduces his exaction to the true point of justice, and reason?   To hold otherwise would be, it is submitted, trifling both with grammar and common justice.   If the statute had conferred the very same power, and in the very same words, upon a court of equity instead of the Commission, could the power of the court to redress the whole grievance be doubted?   But the admitted power of the Commission to command the desistance from a charge of one hundred cents per hundred pounds is no less " judicial " than a requirement not to charge more than the sum found to be reasonable and just.   And the two things are precisely the same in principle and legal effect, and are inseparable.

On the subject of "reparation" provided for in section 3, I ·observe again that this section is to be enforced by the Commission. How is this possibly to be done, otherwise than by commanding action by the carriers suited to the nature of the case, so as to obliterate the whole undue preference, etc., and how possibly otherwise can reparation be made to a locality? Reparation means "restoration" of the right. No such exercise of the power by the Commission is either "fixing rates" or prejudging a matter, as referred to by Mr. Justice Shiras in the Social Circle case.

VI. The words "lawful order" mean an order the Commission has jurisdiction to make. An order may be lawful and at the same time erroneous, so that if the Commission made an order in a matter over which they had jurisdiction, which was merely an error of judgment as to precisely the degree of reparation, for instance, the carrier ought to make, the order would still be lawful. In such a case the court is to "hear and determine the matter," that is, the whole subject, "as a court of equity, . . . in such manner as to do justice in the premises"; that is, complete justice in the whole premises. "Premises" is not merely the particular order that the Commission has made, but it is the whole subject that had been duly brought before the Commission and on due notice and hearing had been acted upon. It is that duty which rested with the Circuit Court and is now imposed upon this court.

All the preceding action described is not "fixing rates" in the sense that state commissioners of railways are authorized by their legislatures to establish general rates for all classes and for all railways, as is contended for by the defendants. We make no such claim. The action of the Commission, and the action of this court, on what is really an appeal from and a review of its judgment, is the trial and determination of a particular case, and determining for that particular case what the conduct of the carrier shall be in respect of the particular dispute involved in it. It is the exertion of no general power to prejudge or to fix rates, nor is it the exertion of any power to fix rates in general. If this distinction be observed,

there is no difficulty whatever. This is precisely in accord
with what Mr. Justice Shiras said. After stating what had
happened before the Commission and stating that in the
Circuit Court evidence was introduced which had not been
laid before the Commission, showing that the rate to Bir-
mingham had been forced down by the coming in of a new
competitive road, and that the Circuit Court had thereupon
found that the evidence was sufficient to overcome the find-
ings of the Commission, and that the rate complained of was
not unreasonable; and after stating that the Circuit Court of
Appeals had adopted the views of the Circuit Court in respect
of the reasonableness of the rate from Cincinnati to Atlanta,
and "as both courts found the existing rate to have been
reasonable, we do not feel disposed to review their finding on
the matter of fact," he then condemned the conduct of the
carriers in lying by. He then says, "Whether Congress in-
tended to confer upon the Interstate Commerce Commission
the power to itself fix rates was mooted in the courts below
and is discussed in the briefs of counsel." He says, "We
do not find any provision in the act which expressly or by
necessary implication confers such power," etc. He then
says, "The reasonableness of the rate in a given case de-
pends on facts, and the function of the Commission is to
consider these facts and give them the proper weight. If the
Commission, instead of withholding judgment in such a mat-
ter until an issue shall be made and the facts found, itself fix
a rate, that rate is prejudged by the Commission to be reason-
able." In this proposition we entirely concur; but in this
case the identical question was raised by the petitions, an
issue was made, evidence was taken on both sides, and the
facts found, so that the sum fixed as reasonable by the Com-
mission was not prejudged. And he adds that "Subject to
the two leading prohibitions that their charges shall not be
unjust and unreasonable, and that they shall not unjustly dis-
criminate so as to give undue preference or advantage, or sub-
ject to undue prejudice or disadvantage persons or traffic
similarly circumstanced, the act to regulate commerce leaves
common carriers as they were at common law." Here again

it will be seen that reasonableness and unreasonableness, justice and injustice, preference, advantage, prejudice, disadvantage are the very subjects that he says are within the competence of the Commission to determine. If the Supreme Court had been of opinion that the action of the Commission in its decision in regard to the Atlanta rate was beyond its jurisdictional power, they would have so said, and affirmed the judgment on that ground; but in distinct terms they affirm the judgment of the Circuit Court and the Court of Appeals upon the express ground that the Commission was in error in its finding of fact.

VII. The judiciary of the United States have recently been able, without the special aid of any act of Congress, to preserve the interstate carriers from being despoiled by unlawful interference with their operations. It is to be hoped for the good name of Congress and for the public welfare and contentment that the same judiciary will find that Congress ·has adequately provided for protecting the people from being despoiled by the carriers, and that it is within the clear competence of the Commission and the courts to make these provisions effectual.

*Mr. Edward Baxter* for appellees.

*Mr. A. A. Wiley* filed a brief for appellees and for the Savannah, Florida and Western Railway Company.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

Several of the assignments of error complain of the action of the Circuit Court of Appeals in not rendering a decree for the enforcement of those portions of the order of the Interstate Commerce Commission which prescribed rates, to be thereafter charged by the defendant companies, for services performed in the transportation of goods.

Discussion of those assignments is rendered unnecessary by the recent decisions of this court, wherein it has been held,

after elaborate argument, that Congress has not conferred upon the Interstate Commerce Commission the legislative power of prescribing rates, either maximum, or minimum, or absolute; and that, as it did not give the express power to the Commission, it did not intend to secure the same result indirectly by empowering that tribunal, after having determined what, in reference to the past, were reasonable and just rates, to obtain from the courts a peremptory order that in the future the railroad companies should follow the rates thus determined to have been in the past reasonable and just. *Cincinnati, New Orleans & Texas Pacific Railway* v. *Interstate Commerce Commission,* 162 U. S. 184; *Interstate Commerce Commission* v. *Cincinnati, New Orleans & Texas Pacific Railway,* 167 U. S. 479.

Errors are likewise assigned to the action of the court in having failed and refused to affirm and enforce the report and opinion of the Commission, wherein it was found and decided, among other things, that the defendants, common carriers which participate in the transportation of class goods to Troy from Louisville, St. Louis and Cincinnati, and from New York, Baltimore and other Northeastern points, and the defendants, common carriers which participate in the transportation of phosphate rock from South Carolina and Florida to Troy, and the defendants, common carriers which participate in the transportation of cotton from Troy to the ports of New Orleans, Brunswick, Savannah, Charleston, West Point or Norfolk, as local shipments or for export, have made greater charges, under substantially similar circumstances and conditions, for the shorter distance to or from Troy than for longer distances over the same lines in the same direction, and have unjustly discriminated in rates against Troy, and subjected said place and dealers and shippers therein to undue and unreasonable prejudice and disadvantage in favor of Montgomery, Eufaula, Columbus and other places and localities and dealers and shippers therein, in violation of the provisions of the act to regulate commerce.

Whether competition between lines of transportation to Montgomery, Eufaula and Columbus justifies the giving to

those cities a preference or advantage in rates over Troy, and, if so, whether such a state of facts justifies a departure from equality of rates without authority from the Interstate Commerce Commission under the proviso to the fourth section of the act, are questions of construction of the statute, and are to be determined before we reach the question of fact in this case.

It is contended, in the briefs filed on behalf of the Interstate Commission, that the existence of rival lines of transportation and, consequently, of competition for the traffic, are not facts to be considered by the Commission, or by the courts, when determining whether property transported over the same line is carried under "substantially similar circumstances and conditions," as that phrase is found in the fourth section of the act.

Such, evidently, was not the construction put upon this provision of the statute by the Commission itself in the present case; for the record discloses that the Commission made some allowance for the alleged dissimilarity of circumstances and conditions, arising out of competition and situation, as affecting transportation to Montgomery and Troy respectively, and that, among the errors assigned, is one complaining that the court erred in not holding that the rates prescribed by the Commission in its order made due allowance for such dissimilarity.

So, too, in *In re Louisville & Nashville Railroad*, 1 Int. C. C. Rep. 31, 78, in discussing the long and short haul clause, it was said by the Commission, per Judge Cooley, that "it is impossible to resist the conclusion that in finally rejecting the 'long and short haul clause' of the House bill, which prescribed an inflexible rule, not to be departed from in any case, and retaining in substance the fourth section as it had passed the Senate, both houses understood that they were not adopting a measure of strict prohibition in respect to charging more for the shorter than for the longer distance, but that they were, instead, leaving the door open for exceptions in certain cases, and, among others, in cases where the circumstances and conditions of the traffic were affected by the

element of competition, and where exceptions might be a necessity if the competition was to continue. And water competition was beyond doubt especially in view."

It is, no doubt, true that in a later case, *Railroad Commission of Georgia* v. *Clyde Steamship Co.*, 5 Int. C. C. Rep. 326, the Commission somewhat modified their holding in the *Louisville and Nashville Railroad Company case*, just cited, by attempting to restrict the competition, that it is allowable to consider, to the cases of competition with water carriers, competition with foreign railroads, competition with railroad lines wholly in a single State; but the principle that competition in such cases is to be considered is affirmed.

That competition is one of the most obvious and effective circumstances that make the conditions, under which a long and short haul is performed, substantially dissimilar, and as such must have been in the contemplation of Congress in the passage of the act to regulate commerce, has been held by many of the Circuit Courts. It is sufficient to cite a few of the number: *Ex parte Koehler*, 31 Fed. Rep. 315; *Missouri Pacific Railway* v. *Texas & Pacific Railway*, 31 Fed. Rep. 862; *Interstate Com. Com.* v. *Atchison, Topeka &c. Railroad*, 50 Fed. Rep. 295; *Same* v. *New Orleans & Texas Pacific Railroad*, 56 Fed. Rep. 925, 943; *Behlmer* v. *Louisville & Nashville Railroad*, 71 Fed. Rep. 835; *Int. Com. Com.* v. *Louisville & Nashville Railroad*, 73 Fed. Rep. 409.

In construing statutory provisions, forbidding railway companies from giving any undue or unreasonable preference or advantage to or in favor of any particular person or company, or any particular description of traffic, in any respect whatever, the English courts have held, after full consideration, that competition between rival lines is a fact to be considered, and that a preference or advantage thence arising is not necessarily undue or unreasonable. *Denaby Main Colliery Co.* v. *Manchester, Sheffield & Lincolnshire Railway*, 11 App. Cas. 97; *Phipps* v. *London & North Western Railway*, 2 Q. B. D. 1892, 229.

But the question whether competition as affecting rates is an element for the Commission and the courts to consider in

applying the provisions of the act to regulate commerce, is not an open question in this court.

In *Interstate Com. Commission* v. *Baltimore & Ohio Railroad,* 145 U. S. 263, it was said, approving observations made by Jackson, Circuit Judge, (43 Fed. Rep. 37,) that the act to regulate commerce was "not designed to prevent competition between different roads, or to interfere with the customary arrangements made by railway companies for reduced fares in consideration of increased mileage, where such reduction did not operate as an unjust discrimination against other persons travelling over the road. In other words it was not intended to ignore the principle that one can sell at wholesale cheaper than at retail; that it is not all discriminations or preferences that fall within the inhibition of the statute, only such as are unjust or unreasonable;" and, accordingly, it was held that the issue by a railway company, engaged in interstate commerce, of a "party-rate ticket" for the transportation of ten or more persons from a place situated in one State or Territory to a place situated in another State or Territory, at a rate less than that charged to a single individual for a like transportation on the same trip, does not thereby make "an unjust or unreasonable charge" against such individual within the meaning of the first section of the act to regulate commerce; nor make "an unjust discrimination" against him within the meaning of the second section; nor give "an undue or unreasonable preference or advantage" to the purchasers of the party-rate ticket within the meaning of the third section.

In *Texas & Pacific Railway* v. *Interstate Com. Com.*, 162 U. S. 197, it was held that "in passing upon questions arising under the act, the tribunal appointed to enforce its provisions, whether the Commission or the courts, is empowered to fully consider all the circumstances and conditions that reasonably apply to the situation, and that, in the exercise of its jurisdiction, the tribunal may and should consider the legitimate interests as well of the carrying companies as of the traders and shippers, and in considering whether any particular locality is subjected to an undue preference or disadvantage, the welfare of the communities occupying the localities where the

goods are delivered is to be considered as well as that of the communities which are in the locality of the place of shipment; that among the circumstances and conditions to be considered, as well in the case of traffic originating in foreign ports as in the case of traffic originating within the limits of the United States, competition that affects rates should be considered, and in deciding whether rates and charges, made at a low rate to secure foreign freights which would otherwise go by other competitive routes, are or are not undue and unjust, the fair interests of the carrier companies and the welfare of the community which is to receive and consume the commodities are to be considered."

To prevent misapprehension, it should be stated that the conclusion to which we are led by these cases, that, in applying the provisions of the third and fourth sections of the act, which make it unlawful for common carriers to make or give any undue or unreasonable preference or advantage to any particular person or locality, or to charge or receive any greater compensation in the aggregate for the transportation of passengers or of like kind of property, under substantially similar circumstances and conditions, for a shorter than for a longer distance over the same line, in the same direction, competition which affects rates is one of the matters to be considered, is not applicable to the second section of the act.

As we have shown in the recent case of *Wight* v. *United States*, 167 U. S. 512, the purpose of the second section is to enforce equality between shippers over the same line, and to prohibit any rebate or other device by which two shippers, shipping over the same line, the same distance, under the same circumstances of carriage, are compelled to pay different prices therefor; and we there held that the phrase "under substantially similar circumstances and conditions," as used in the second section, refers to the matter of carriage, and does not include competition between rival routes.

This view is not open to the criticism that different meanings are attributed to the same words when found in different sections of the act; for what we hold is that, as the purposes of the several sections are different, the phrase under

consideration must be read, in the second section, as restricted to the case of shippers over the same road, thus leaving no room for the operation of competition, but that in the other sections, which cover the entire tract of interstate and foreign commerce, a meaning must be given to the phrase wide enough to include all the facts that have a legitimate bearing on the situation — among which we find the fact of competition when it affects rates.

In order further to guard against any misapprehension of the scope of our decision it may be well to observe that we do not hold that the mere fact of competition, no matter what its character or extent, necessarily relieves the carrier from the restraints of the third and fourth sections, but only that these sections are not so stringent and imperative as to exclude in all cases the matter of competition from consideration in determining the questions of " undue or unreasonable preference or advantage," or what are "substantially similar circumstances and conditions." The competition may in some cases be such as, having due regard to the interests of the public and of the carrier, ought justly to have effect upon the rates, and in such cases there is no absolute rule which prevents the commission or the courts from taking that matter into consideration.

It is further contended, on behalf of the appellant, that the courts below erred in holding, in effect, that competition of carrier with carrier, both subject to the act to regulate commerce, will justify a departure from the rule of the fourth section of the act without authority from the Interstate Commerce Commission, under the proviso to that section.

In view of the conclusion hereinbefore reached, the proposition comes to this, that, when circumstances and conditions are substantially dissimilar, the railway companies can only avail themselves of such a situation by an application to the Commission.

The language of the proviso is as follows :

" That upon application to the Commission appointed under the provisions of this act, such common carrier may, in special cases, after investigation by the Commission, be authorized to

charge less for longer than shorter distances for the transpor-
tation of passengers or property, and the Commission may
from time to time prescribe the extent to which such desig-
nated common carrier may be relieved from the operation of
this section of this act."

The claim now made for the Commission is that the only
body which has the power to relieve railroad companies from
the operation of the long and short haul clause on account
of the existence of competition, or any other similar element
which would make its application unfair, is the Commission
itself, which is bound to consider the question, upon applica-
tion by the railroad company, but whose decision is discretion-
ary and unreviewable.

The first observation that occurs on this proposition is that
there appears to be no allegation in the bill or petition raising
such an issue.  The gravamen of the complaint is that the
defendant companies have continued to charge and collect a
greater compensation for services rendered in transportation
of property than is prescribed in the order of the Commission.
It was not claimed that the defendants were precluded from
showing in the courts that the difference of rates complained
of was justified by dissimilarity of circumstances and condi-
tions, by reason of not having applied to the Commission to be
relieved from the operation of the fourth section.

Moreover, this view of the scope of the proviso to the fourth
section does not appear to have ever been acted upon or en-
forced by the Commission.  On the contrary, in the case of
*In re Louisville & Nashville Railroad* v. *Interstate Com. Com.*,
1 Int. C. C. Rep. 31, 57, the Commission, through Judge Cooley,
said, in speaking of the effect of the introduction into the
fourth section of the words "under substantially similar cir-
cumstances and conditions," and of the meaning of the pro-
viso: "That which the act does not declare unlawful must
remain lawful if it was so before, and that which it fails to
forbid, the carrier is left at liberty to do, without permission
of any one.  .  .  . The charging or receiving the greater
compensation for the shorter than for the longer haul is seen
to be forbidden only when both are under substantially similar

circumstances and conditions; and, therefore, if in any case the carrier, without first obtaining an order of relief, shall depart from the general rule, its doing so will not alone convict it of illegality, since, if the circumstances and conditions of the two hauls are dissimilar, the statute is not violated. . . . Beyond question, the carrier must judge for itself what are the 'substantially similar circumstances and conditions' which preclude the special rate, rebate or drawback, which is made unlawful by the second section, since no tribunal is empowered to judge for it until after the carrier has acted, and then only for the purpose of determining whether its action constitutes a violation of law. The carrier judges on peril of the consequences; but the special rate, rebate or drawback which it grants is not illegal when it turns out that the circumstances and conditions were not such as to forbid it; and as Congress clearly intended this, it must also, when using the same words in the fourth section, have intended that the carrier, whose privilege was in the same way limited by them, should in the same way act upon its judgment of the limiting circumstances and conditions."

The view thus expressed has been adopted in several of the Circuit Courts: *Interstate Com. Com.* v. *Atchison, Topeka &c. Railroad,* 50 Fed. Rep. 295, 300; *Same* v. *Cincinnati, N. O. and Tex. Pac. Railway,* 56 Fed. Rep. 925, 942; *Behlmer* v. *Louisville & Nashville Railroad,* 71 Fed. Rep. 835, 839; and we do not think the courts below erred in following it in the present case. We are unable to suppose that Congress intended, by the fourth section and the proviso thereto, to forbid common carriers, in cases where the circumstances and conditions are substantially dissimilar, from making different rates until and unless the Commission shall authorize them so to do, much less do we think that it was the intention of Congress that the decision of the Commission, if applied to, could not be reviewed by the courts. The provisions of section 16 of the act, which authorize the court to "proceed to hear and determine the matter speedily as a court of equity, and without the formal pleadings and proceedings applicable to ordinary suits in equity, but in such manner as to do jus-

tice in the premises, and to this end, such court shall have power, if it think fit, to direct and prosecute in such mode and by such persons as it may appoint, all such inquiries as the court may think needful to enable it to form a just judgment in the matter of such petition," extend as well to an inquiry or proceeding under the fourth section as to those arising under the other sections of the act.

Upon these conclusions, that competition between rival routes is one of the matters which may lawfully be considered in making rates, and that substantial dissimilarity of circumstances and conditions may justify common carriers in charging greater compensation for the transportation of like kinds of property for a shorter than for a longer distance over the same line, we are brought to consider whether, upon the evidence in the present case, the courts below erred in dismissing the Interstate Commerce Commission's complaint.

As the third section of the act, which forbids the making or giving any undue or unreasonable preference or advantage to any particular person or locality, does not define what, under that section, shall constitute a preference or advantage to be undue or unreasonable, and as the fourth section, which forbids the charging or receiving greater compensation in the aggregate for the transportation of like kinds of property for a shorter than for a longer distance over the same line, under substantially similar circumstances and conditions, does not define or describe in what the similarity or dissimilarity of circumstances and conditions shall consist, it cannot be doubted that whether, in particular instances, there has been an undue or unreasonable prejudice or preference, or whether the circumstances and conditions of the carriage have been substantially similar or otherwise, are questions of fact depending on the matters proved in each case. *Denaby Main Colliery Company* v. *Manchester &c. Railway Co.*, 3 Railway & Canal Traffic Cases, 426 ; *Phipps* v. *London & North Western Railway*, 1892, 2 Q. B. D. 229 ; *Cincinnati, N. O. & Tex. Pac. Railway* v. *Interstate Com. Com.*, 162 U. S. 184, 194 ; *Texas and Pacific Railway* v. *Interstate Com. Com.*, 162 U. S. 197, 235.

The Circuit Court, after a consideration of the evidence, expressed its conclusion thus:

"In any aspect of the case it seems impossible to consider this complaint of the Board of Trade of Troy against the defendant railroad companies, particularly the Midland and Georgia Central railroads, in the matter of the charge upon property transported on their roads to or from points east or west of Troy, as specified and complained of, obnoxious to the fourth or any other section of the interstate commerce act. The conditions are not substantially the same and the circumstances are dissimilar, so that the case is not within the statute. The case made here is not the case as it was made before the Commission. New testimony has been taken, and the conclusion reached is that the bill is not sustained; that it should be dismissed, and it is so ordered." 69 Fed. Rep. 227.

The Circuit Court of Appeals, in affirming the decree of the Circuit Court, used the following language:

"Only two railroads, the Alabama Midland and the Georgia Central, reach Troy. Each of these roads has connection with other lines, parties hereto, reaching all the long-distance markets mentioned in these proceedings. The Commission finds that no departure from the long and short haul rule of the fourth section of the statute as against Troy as the shorter distance point, and in favor of Montgomery as the longer distance point, appears to be chargeable to the Georgia Central. The rates in question when separately considered, are not unreasonable or unjust. As a matter of business necessity they are the same by each of the railroads that reach Troy. The Commission concludes that, as related to the rates to Montgomery, Columbus and Eufaula, the rates to and from Troy unjustly discriminate against Troy and in the case of the Alabama Midland violate the long and short haul rule.

"The population and volume of business at Montgomery are many times larger than at Troy. There are many more railway lines running to and through Montgomery, connecting with all the distant markets. The Alabama River, open all the year, is capable, if need be, of bearing to Mobile on the sea the burden of all the goods of every class that

pass to or from Montgomery. The competition of the railway lines is not stifled, but is fully recognized and intelligently and honestly controlled and regulated by the traffic association in its schedule of rates. There is no suggestion in the evidence that the traffic managers who represent the carriers that are members of that association are incompetent or under the bias of any personal preference for Montgomery or prejudice against Troy that has led them, or is likely to lead them, to unjustly discriminate against Troy. When the rates to Montgomery were higher a few years ago than now, actual active water-line competition by the river came in, and the rates were reduced to the level of the lowest practical paying water rates, and the volume of carriage by the river is now comparatively small, but the controlling power of that water line remains in full force, and must ever remain in force as long as the river remains navigable to its present capacity. And this water line affects to a degree less or more all the shipments to or from Montgomery from or to all the long-distance markets. It would not take cotton from Montgomery to the South Atlantic ports for export, but it would take the cotton to the points of its ultimate destination if the railroad rates to foreign marts through the Atlantic ports were not kept down to or below the level of profitable carriage by water from Montgomery through the port of Mobile. The volume of trade to be competed for, the number of carriers actively competing for it, and a constantly open river present to take a large part of it whenever the railroad rates rise up to the mark of profitable water carriage, seem to us, as they did to the Circuit Court, to constitute circumstances and conditions at Montgomery substantially dissimilar from those existing at Troy, and to relieve the carriers from the charges preferred against them by the Board of Trade. We do not discuss the third and fourth contention of the counsel for the appellant further than to say that, within the limits of the exercise of intelligent good faith in the conduct of their business, and subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate so as to give undue preference

or disadvantage to persons or traffic similarly circumstanced, the act to regulate commerce leaves common carriers, as they were at the common law, free to make special rates looking to the increase of their business, to classify their traffic, to adjust and apportion their rates so as to meet the necessities of commerce and of their own situation and relation to it, and generally to manage their important interests upon the same principles which are regarded as sound and adopted in other trades and pursuits. The carriers are better qualified to adjust such matters than any court or board of public administration, and, within the limitations suggested, it is safe and wise to leave to their traffic managers the adjusting of dissimilar circumstances and conditions to their business." 41 U. S. App. 453.

The last sentence in this extract is objected to by the Commission's counsel, as declaring that the determination of the extent to which discrimination is justified by circumstances and conditions should be left to the carriers. If so read, we should not be ready to adopt or approve such a position. But we understand the statement, read in the connection in which it occurs, to mean only that, when once a substantial dissimilarity of circumstances and conditions has been made to appear, the carriers are, from the nature of the question, better fitted to adjust their rates to suit such dissimilarity of circumstances and conditions than courts or commissions ; and when we consider the difficulty, the practical impossibility, of a court or a commission taking into view the various and continually changing facts that bear upon the question, and intelligently regulating rates and charges accordingly, the observation objected to is manifestly just. But it does not mean that the action of the carriers, in fixing and adjusting the rates, in such instances, is not subject to revision by the Commission and the courts, when it is charged that such action has resulted in rates unjust or unreasonable, or in unjust discriminations and preferences. And such charges were made in the present case, and were considered, in the first place by the Commission, and afterwards by the Circuit Court and by the Circuit Court of Appeals.

The first contention we encounter, upon this branch of the case, is that the Circuit Court had no jurisdiction to review the judgment of the Commission upon this question of fact; that the court is only authorized to inquire whether or not the Commission has misconstrued the statute and thereby exceeded its power; that there is no general jurisdiction to take evidence upon the merits of the original controversy; and, especially, that questions under the third section are questions of fact and not of power, and hence unreviewable.

We think this contention is sufficiently answered by simply referring to those portions of the act which provide that, when the court is invoked by the Commission to enforce its lawful orders or requirements, the court shall proceed, as a court of equity, to hear and determine the matter, and in such manner as to do justice in the premises.

In the case of *Cincinnati, N. O. and Texas Pac. Railway* v. *Int. Com. Com.*, 162 U. S. 184, the findings of the Commission were overruled by the Circuit Court, after additional evidence taken in the court, and the decision of the Circuit Court was reviewed in the light of the evidence and reversed by the Circuit Court of Appeals, and this court, in reference to the argument that the Commission had not given due weight to the facts that tended to show that the circumstances and conditions were so dissimilar as to justify the rates charged, held that as the question was one of fact, peculiarly within the province of the Commission, and as its conclusions had been accepted and approved by the Circuit Court of Appeals, and as this court found nothing in the record that made it our duty to draw a different conclusion, the decree of the Circuit Court of Appeals should be affirmed. Such a holding clearly implies that there was power in the courts below to consider and apply the evidence and in this court to review their decisions.

So in the case of *Texas & Pacific Railway* v. *Interstate Com. Com.*, 162 U. S. 197, the decision of the Circuit Court of Appeals, which affirmed the validity of the order of the Commission, upon the ground that, even if ocean competition should be regarded as creating a dissimilar condition, yet that,

in the case under consideration, the disparity in rates was too great to be justified by that condition, was reversed by this court, not because the Circuit Court had no jurisdiction to consider the evidence and thereupon to affirm the validity of the order of the Commission, but because that issue was not actually before the court, and that no testimony had been adduced by either party on such an issue; and it was said that the language of the act authorizing the court to hear and determine the matter as a case of equity, " necessarily implies that the court is not concluded by the findings or conclusions of the Commission."

Accordingly our conclusion is that it was competent, in the present case, for the Circuit Court, in dealing with the issues raised by the petition of the Commission and the answers thereto, and for the Circuit Court of Appeals on the appeal, to determine the case upon a consideration of the allegations of the parties and of the evidence adduced in their support, giving effect, however, to the findings of fact in the report of the Commission as *prima facie* evidence of the matters therein stated.

It has been uniformly held by the several Circuit Courts and the Circuit Courts of Appeal, in such cases, that they are not restricted to the evidence adduced before the Commission, nor to a consideration merely of the power of the Commission to make the particular order under question, but that additional evidence may be put in by either party, and that the duty of the court is to decide, as a court of equity, upon the entire body of evidence.

Coming at last to the questions of fact in this case, we encounter a large amount of conflicting evidence. It seems undeniable, as the effect of the evidence on both sides, that an actual dissimilarity of circumstances and conditions exists between the cities concerned, both as respects the volume of their respective trade and the competition, affecting rates, occasioned by rival routes by land and water. Indeed, the Commission itself recognized such a state of facts by making an allowance, in the rates prescribed, for dissimilarity resulting from competition, and it was contended on behalf of the Com-

mission, both in the courts below and in this court, that the competition did not justify the discriminations against Troy to the *extent* shown, and that the allowance made therefor by the Commission was a *due* allowance.

The issue is thus restricted to the question of the preponderance of the evidence on the respective sides of the controversy. We have read the evidence disclosed by the record, and have endeavored to weigh it with the aid of able and elaborate discussions by the respective counsel.

No useful purpose would be served by an attempt to formally state and analyze the evidence, but the result is that we are not convinced that the courts below erred in their estimate of the evidence, and that we perceive no error in the principles of law on which they proceeded in the application of the evidence.

The decree of the Circuit Court of Appeals is accordingly

*Affirmed.*

Mr. Justice. Harlan, dissenting.

I dissent from the opinion and judgment in this case. Taken in connection with other decisions defining the powers of the Interstate Commerce Commission, the present decision, it seems to me, goes far to make that commission a useless body for all practical purposes, and to defeat many of the important objects designed to be accomplished by the various enactments of Congress relating to interstate commerce. The Commission was established to protect the public against the improper practices of transportation companies engaged in commerce among the several States. It has been left, it is true, with power to make reports, and to issue protests. But it has been shorn, by judicial interpretation, of authority to do anything of an effective character. It is denied many of the powers which, in my judgment, were intended to be conferred upon it. Besides, the acts of Congress are now so construed as to place communities on the lines of interstate commerce at the mercy of competing railroad companies engaged in such commerce. The judgment in this case, if I do not misapprehend its scope and effect,

proceeds upon the ground that railroad companies, when competitors for interstate business at certain points, may, in order to secure traffic for and at those points, establish rates that will enable them to accomplish that result, although such rates may discriminate against intermediate points. Under such an interpretation of the statutes in question, they may well be regarded as recognizing the authority of competing railroad companies engaged in interstate commerce — when their interests will be subserved thereby — to build up favored centres of population at the expense of the business of the country at large. I cannot believe that Congress intended any such result, nor do I think that its enactments, properly interpreted, would lead to such a result.