18401

ATLANTIC COAST LINE RAILROAD COMPANY *et al.,* Appellants, v. SOUTH CAROLINA PUBLIC SERVICE COMMISSION *et al.,* Respondents.

(144 S. E. (2d) 212)

*Messrs. David E. Wells,* of Jacksonville, Florida, *McKay, McKay, Black & Walker* and *N. Heyward Clarkson,* of Columbia, *Wilcox, Hardee, Houck & Palmer,* of Florence, *Donal L. Turkal,* of Richmond, Virginia, and *L. Marion Gressette,* of St. Matthews, *for Appellants,*

*Messrs. Daniel R. McLeod, Attorney General,* and *Harry M. Lightsey, Jr., Assistant Attorney General, for Defendant-Respondent,*

*Messrs. Robinson, McFadden & Moore,* of Columbia, *J. D. Parler,* of St. George, *Marshall B. Williams,* of Orangeburg, and *Earl E. Eisenhart, Jr.,* of Washington, D. C., *for Southern Railway System, Defendant-Respondent,*

*Messrs. David E. Wells,* of Jacksonville, Florida, *McKay, McKay, Black & Walker,* and *N. Heyward Clarkson,* of Columbia, *Wilcox, Hardee, Houck & Palmer,* of Florence, *Donal L. Turkal,* of Richmond, *Virginia,* and *L. Marion Gressete,* of St. Matthews, *for Appellants, in Reply,*

September 22, 1965.

TAYLOR, Chief Justice.

This is an appeal from a Decree of the Court of Common Pleas for Orangeburg County refusing to set aside and vacate an Order of the Public Service Commission of South Carolina which permits the Southern Railway to publish freight rates for intrastate transportation of sand, gravel and crushed stone in open top articulated cars between designated points on the Southern Railway system.

The Order of the Commission under attack appears as follows:

"No. 12121 involves rates and related tariff provisions which were authorized by us, in the absence of any known objections, upon the application of Southern Railway Company and certain of its System Lines, which were initially published in Supplements 105-A and 105-B to Southern Freight Tariff Bureau's Tariff 388-J effective April 4, 1963. After these tariff provisions were published and made effective, protests and requests for hearing reached the Commission, and the proceedings under this docket were instituted, by our notice dated May 3, 1963, for the purpose of determining whether our authorizations should be affirmed, revoked, or modified in any respect.

"On May 4, 1963, we received the application involved in Docket No. 12122, Sand to Charleston, and being then aware of objections of certain shipping interests, the authorization sought was not extended and the tariff changes proposed were assigned for hearing along with the matters involved in No. 12121. Our hearing notice respecting this docket, issued May 7, 1963, set forth the rates proposed.

"We have heard the parties in extended oral hearings, on brief, and in oral argument.

"Applicant's Evidence

"After describing the tariff provisions involved in these proceedings, both authorized and proposed, applicant's traffic witness presented statistical exhibits showing the production of sand, stone and gravel in South Carolina for a ten-year period, 1952 thru 1961. Using the 1952 production as index 100, the witness explained that production in the State had increased 137% over 1952, but that originations by the Southern Railway in South Carolina declined from 1,729,-034 tons to 943,557 tons, or approximately 12 percent of the total. In 1952, Southern handled approximately 51 percent of total production. The witness attributed the loss of tonnage, and the decline of Southern's percentage of production to a number of possible factors, such as roadside pits and quarries in competition with such operations established on rail lines, to non-rail job site locations where trucking from pit or quarry to the job is less expensive overall than the combined cost of shipping by rail to a nearby railhead for trucking beyond, and to a conviction by officials of his Company that existing rail rates were just too high to permit producers to quote competitive prices for particular jobs. In an effort to increase its handling of construction aggregates traffic, Southern determined to offer shippers on its line incentive rates applicable in connection with 100-ton minimum shipments; rates described of record as bare-bone rates, stripped of any inflation to cover such things as weighing, possible absorption of connecting line switching at either origin or destination or both, and rates contemplating a minimum of equipment tie-up time for loading and unloading without penalty.

"To provide equipment to accommodate the heavier loading contemplated in connection with incentive rates, without going into the equipment market for purchase of new and expensive cars of high capacity, Southern decided to articulate two of its commonly called 50-ton open top hopper cars by permanently joining the center couplings, making other minor modifications, and restenciling the multiunit car so

converted with a single car initial and number. Southern Railway owns 4,332 old 50 and 55-ton open top hoppers, described as being outmoded and destined for an early trip to the scrap pile, if not used to construct articulated cars to move the aggregates traffic at reduced rates. Of this total ownership, 2,423 of the cars are now completely depreciated, and have a scrap value of approximately $300 per car. At the time of one of the hearing dates, July 17, 1963, Southern had built and put in service 210 articulated cars, and was constructing them at the rate of about 12 cars per week, with the intention of enlarging its fleet sufficiently to satisfy anticipated demands for such equipment.

"On the principle that the traffic generated by the articulated-car incentive rates will be added traffic which Southern would not otherwise obtain, and that such added traffic will be handled in train service already being operated at less than maximum tonnage, and with the exclusion of cost elements not present in conjunction with the utilization of fully depreciated equipment, Southern's cost witness presented evidence and explanatory testimony showing, in connection with assumed loads of 130 tons per car and 140 tons per car, that revenues derived from rates in effect, as well as from those proposed herein, would exceed cost by considerable amounts. For example, a 130-ton consignment of stone from Beverly to Greenville would produce revenue of $38.10, with cost of $19.76, while a 140-ton consignment would produce revenue of $39.80 with a cost of $19.97. Similarly, a 130-ton car of sand from Hagood to Charleston would produce revenue of $89.70 with cost of $48.23, while a 140-ton car would produce revenue of $93.60 against $49.40 cost. The costing elements used by the witness are known in cost finding circles as incremental costs; that is to say, briefly, those added costs directly incurred in the handling of added business resulting from minimum pricing of railroad services. In support of this costing technique, the witness presented, as an exhibit, a pamphlet issued by a group of recognized economists and transportation special-

ists, prepared under the auspices of the Association of American Railroads.

"In support of its case, Southern presented twelve witnesses who were officials of aggregates producing concerns, aggregates consuming firms, and contracting firms engaged in road building and other construction activities. All of these witnesses supported Southern's articulated-car rates on construction aggregates, and urged that we affirm authorizations of rates already in effect and/or authorize those proposed in Docket 12122.

"Protesting Railroads' Evidence

"Atlantic Coast Line Railroad Company and Seaboard Air Line Railroad Company protested Southern's articulated-car rates on construction aggregates, those authorized and in effect as well as those proposed herein. The traffic witness for these protestants presented a number of exhibits, and gave extended testimony in explanation of them. The witness traced, in chronological order, mileage scale rates generally applicable on the sand, gravel and crushed stone traffic, in open top hopper cars, back to the Docket 17517 scales[1] in effect January 17, 1934, comparing the various scales effective down through the years with presently effective scales on this traffic. Since the earlier announcements by Southern to establish articulated-car rates on construction aggregates, traffic officials of Coast Line have been endeavoring to secure from Southern officials their 'scale' for arriving at such rates, but have had no success in doing so. Accordingly, using the specific rates already published and in effect on state and interstate traffic, and determining the mileages between origin and destination, the witness constructed his own articulated-car rate scale for various scale and revenue comparisons. He also made comparisons of revenue yields from aggregates traffic in articulated cars from and to points involved in these proceedings with rev-

---

[1] Rates on Chert, Clay, Sand and Gravel within State of Georgia, 122 ICC 133-176, decided January 21, 1927.

enue yields from fine coal traffic moving from mines in the Kentucky, Tennessee and Virginia fields to Tennessee and North Carolina points of approximately the same distances, which the witness stated were under attack in ICC Docket No. 34099 as being unreasonably low, and comparisons of revenue yields in the various mileage blocks resulting from his constructive articulated-car mileage scale with yields resulting from the mileage scale applicable to single line movements of pulpwood in Southern Territory.

"Sand pit operators at Dixiana, a local station on protesting Seaboard's line, six rail miles south of Columbia, have been disposing of some of their production in the Greenville, Spartanburg and Anderson markets. Protesting railroads show a comparison between Dixiana and Shuler (a local station on the Southern, 12 rail miles south of Columbia), indicating Dixiana's disability in these markets under the normal single car single and joint line mileage scales, and Dixiana's disability in these markets under the articulated car rates now applicable from Shuler via the Southern direct. Under the normal single car single and joint line mileage scales, Dixiana had no disability in the Greenville market; the shorter joint line distance applied to the joint line scale making an identical rate as that obtained from using Southern's longer single line route applied to the single line scale.

"Protesting railroads' mechanical witness testified that he had viewed some of Southern's articulated cars, and expressed the opinion that except for the manner of stenciling the car initial and number thereupon it would be difficult for him to tell them from two standard 50-ton hopper cars coupled together in the usual manner. This witness' view of what constitutes an articulated car is one which has a common center truck supporting the two adjacent ends of body portions, a process of articulation involving considerable expense. It was viewed that Southern's articulated cars might normally be expected to give six or seven years of service, and would then be in need of costly heavy repairs, unless scrapped.

"The protesting railroads also presented a cost witness. He introduced a cost study exhibit he prepared showing comparative out-of-pocket costs and rates of sand, gravel and crushed stone in South Carolina, expressed in cents per ton for 60, 100, 120, 130 and 140 tons. His cost presentation was based on ICC Rail Form A, Southern Region, Year 1961, using Southern Region average costs, which he stated he believed to be the best evidence available. According to this presentation, even the presently effective single and joint line single car scales are failing to yield out-of-pocket costs in all but a very few mileage blocks, and 100-ton consignments, loaded in two cars simply coupled together, moving single line would not yield costs at hauls under 60 miles, nor moving joint line for hauls up to 80 miles. This witness' method of determining costs, of course, applied to Southern's articulated-car rates, shows costs per ton in excess of rate per ton in every mileage block irrespective of quantity per articulated car.

## "Protesting Sand Shippers' Evidence

"Sand pit operators at Dixiana and Johnsonville, both points local stations on the Seaboard Air Line Railroad Company, testified in opposition to Southern's articulated rates, both those in effect and those proposed on sand to Charleston. The Dixiana pit operators use rail service for marketing some of their production, but the Johnsonville operators use truck transportation. One of the Dixiana operators, who disposed of considerable production in the Piedmont area of the State, stated he lost some 7,000 tons of business, per month, in that area following establishment of the articulated-car rates from Shuler and Hagood. Dollarwise, the tonnage amounted to some $3,500 of gross sales. His concern retains some of its market in the Piedmont; primarily special purpose sands shipped in box car equipment. The other Dixiana producers lost some customers, but did not have their sales so concentrated in the Piedmont area. The Johnsonville producer once had rail sidetrack facilities into his plant, but determined to employ truck

transportation in the distribution of his production and had his rail sidetrack removed. This producer markets in the Myrtle Beach area and at other points in Horry, Marion and Florence Counties. This protestant appeared primarily concerned with possible adoption or articulated-car rates by other rail lines in the State and the competitive effect of such rates on his non-rail operations.

"Evidence of Other Protestants

"A number of motor carrier interests appeared at the hearings in protest of Southern's articulated-car rates. Some of these interests were carriers of aggregates, while others were allied interests engaged in servicing the motor carrier industry with trucks, trailers, fuels, tires and other supplies. The carrier interests, some of which are also engaged in so-called buy-and-sell operations in aggregates, claimed that Southern's articulated-car rates would effectively eliminate them from competing for the business of larger consumers, particularly those so situated as to accommodate rail deliveries. One motor carrier witness described conditions in the aggregates transportation business as bad because of competition and rate cutting within the industry. The various motor carrier service and supply firms, protesting in behalf of the motor carriers, fear that a reduction in motor carrier activities might reduce their sales of equipment and supplies.

"Ready mixed concrete and concrete products dealers and manufacturers, and sand brokers, who heretofore found it advantageous to establish their operations at non-rail locations, and to depend upon truck transportation, public or private, for inbound movements of materials and outbound movements of products, also protested Southern's articulated-car rates upon the grounds that competitors having rail facilities would be enabled to obtain materials at lower delivered costs, thus being able to produce and undersell these protestants.

## "Intervener's Evidence

"The representative member of the Legislative Committee to Study the Trucking Industry in the State, who is also general manager of Motor Truck Rate Bureau, Inc., intervener as interests develop, stated that his principal interest in this proceeding rested in whether or not Southern's articulated-car rates are compensatory to the extent that they cover cost plus a reasonable margin of profit. He introduced an exhibit, based upon a 130-ton articulated-carload, setting forth revenues that would be derived under the various rates involved in this proceeding, the Southern Railway distances involved, and ton-mile earnings ranging from $0.0293 for the shortest haul down to $0.0051 for the longest. Most of the ton-mile earnings are below the one-cent level. The exhibit also set forth Southern's 1962 systemwide ton-mile earnings from freight traffic ($0.0153), and Southern's systemwide freight expenses per ton-mile ($0.0094), computed from figures obtained from Schedule 300 in Southern's 1962 annual report on file with us.

## "Discussion and Conclusions

"The transcript of these proceedings consisted of 1,347 reproduced typewritten pages, much of it devoted to cross-examination of the witnesses. We have carefully considered all the contentions of the parties. There are inferences of record that our approval of rates such as those involved here will force shippers, motor carriers and allied interests, aggregates buy-and-sell operators, sand brokers, and concrete products people out of business, and that license fees, sales, taxes, income taxes, and employment will be reduced. Certainly we have no desire whatsoever to force anyone out of business, or to adversely affect license fees, tax takes, or employment, but the statutes imposing upon us the duty to fix or approve just and reasonable rates and charges, for rail lines or motor carriers, do not direct that we discharge our duty with regard to whether or not such considerations will be increased or diminished.

"It has seemed to us from the outset that we are here concerned with two fundamental, basic, questions for determination, and we asked the parties to address their briefs to them; namely, (1) are the rates involved compensatory, and (2) are they discriminatory?

"Three cost studies were introduced; one by the Southern itself, another by protesting railroads, and the third by an intervener. All three show differing results, as might be expected from the differing approaches and differing inclusions and exclusions. Southern's own incremental cost showing indicates that its cost of handling the traffic here involved will run from approximately 50% of revenue in most instances, up to about 75% of revenue in a few instances, and this should afford sufficient margin of revenue over cost to make a substantial contribution to net income.

"On the question of discrimination, the statutes condemning various sorts of discrimination by railroads appear quite clear. Though the points of origin and destination involved in this proceeding are relatively few, Southern has made it clear that it stands ready, with our approval, to accord any other aggregates shippers or receivers on its lines equal treatment. Since there are no presently effective, or proposed, joint line articulated-car rates, no discrimination by Southern between or amongst its connections appears.

"Upon consideration of the testimony and evidence submitted,

"It is ordered, That our prior authorizations of rates already in effect, and involved in Docket No. 12121, be, and they hereby are, affirmed;

"It is further ordered, That the rates proposed in Docket No. 12122 be, and they hereby are, authorized;

"It is further ordered, That if, upon shipper's order, no articulated cars are available, the Southern Railway Company be, and it hereby is, required to furnish in lieu thereof two (2) fifty-ton open top hopper cars, with couplers immobilized for the trip, and protect the articulated-car rates on the movement;

"And it is further ordered, That these proceedings be discontinued.

"This 11th day of December, 1963."

The Court of Common Pleas for Orangeburg County, after hearing, dismissed Appellant's complaint in which it is contended that the rates approved by the Commission are (1) discriminatory and (2) noncompensatory; and Appellants now come to this Court upon exceptions which present the same contentions here.

"The rule of judicial review of a commission order relating to railroad companies is that the commission's findings of fact are prima facie correct and should not be set aside unless clearly against the weight of the evidence. Such an order must be reasonable but it is presumptively so, and will not be reversed upon review unless it is shown to be clearly unjust and unreasonable. *Southern R. Co. v. Public Service Commission,* 195 S. C. 247, 10 S. E. (2d) 769. Tested by these rules, the judgment under appeal must be affirmed." *Atlantic Coast Line R. Co. v. Public Service Commission et al.,* 225 S. C. 196, 81 S. E. (2d) 357.

From 1952 to 1961 the production of sand, gravel and crushed stone in this State increased 137 percent while the shipments originating in this State on Southern declined some 45 percent. In 1953, the railroads were transporting approximately 35 percent of the sand, gravel and crushed stone moving in intrastate commerce in this State while in 1961, the railroads' share of intrastate traffic was only 17 percent and the trucks were hauling 83 percent of such commodities. Faced with such loss of traffic in these commodities, Southern made a study of the causes with a view to recapturing some of the lost business and found itself with more than 4000 obsolete 50-ton hopper cars with only a scrap metal value unless they could be used to transport bulk products such as sand and gravel which is an important commodity in this area. Southern's engineers developed a

technique for permanently joining two of these hopper cars together in such a way that they are operated as one and referred to in the record as an articulated car, resulting in operation savings. This study further revealed that for many years prior to the date of the filing of its petition all of the Southern trains carrying freight in this State were carrying tonnage substantially below the carrying capacity of these trains, which are required to operate irrespective of its traffic in sand and gravel. Taking into consideration these factors, Southern designed new rates for the transportation of sand, gravel and crushed stone on the basis of incremental costs. In so doing it eliminated depreciation and other capital costs since the articulated car was obsolete and had no value other than for scrap unless it could be used as proposed. Further, it eliminated from the rates costs which the railroad is required to bear whether it carried sand and gravel or not; and it is these rates which Appellants contend are noncompensatory. The evidence reveals that with the average loading of a 130-ton articulated car the rates will produce revenues which will return to Southern amounts ranging from $8.68 to $55.10 per car over and above the incremental costs, and if the average loading is raised to an expected 140 tons, this return will be even greater. If under the proposed rates Southern carries one additional car of sand, gravel or crushed stone at the rates approved by the Commission, it will receive back substantially all of the added cost of carrying this car and in addition an amount which will go to defray other costs of the operation.

The incremental cost theory was recommended to the railroads after a study was made for the Association of American Railroads in 1962 by a group of recognized economists as a sound approach to the design of railroad financing, and this theory is not too different from what has already been practiced for a number of years by many carriers, such as excursions to and from designated points at reduced rates. The airlines have in effect what are known as family rates.

It is not illogical to say that rates cannot successfully be fixed on all commodities on a per ton-per mile basis but must be designed to reflect competitive conditions and so long as the rates as a whole afford railroads just compensation for the overall services they are just and reasonable and constitutional. Even in some extreme instances, noncompensatory rates for carrying some commodities when the public interest is served have been approved. See *Baltimore and Ohio v. United States,* 345 U. S. 146. The evidence in this case is susceptible of the conclusion that the rates approved by the Commission will return to Southern revenues in excess of its incremental costs and, therefore, cannot as a matter of law be said to be noncompensatory.

Appellants contend that the rates approved by the Commission are discriminatory for the reasons that (1) they are published on a point-to-point basis rather than on a mileage scale basis, (2) different rates apply to an articulated car as compared to two ordinary 50-ton hoppers coupled together in a normal way over equal distances and (3) discrimination results from using the added traffic theory of making rates, *i. e.,* the incremental cost theory discussed above.

Unjust discrimination in the fixing of rates for intrastate transportation of freight is specifically prohibited, Constitution for South Carolina, 1895, Art. 9, Section 5; Section 58-1061, *et seq.,* Code of Laws of South Carolina, 1962.

None of the Appellants herein are shippers or receivers located upon the lines of Southern or served by it; therefore, they have not been discriminated against by Southern's rate charges as "A carrier cannot discriminate within the meaning of the statute except as between those whom it serves or whom it may lawfully be required to serve." *Chicago Lumber and Coal Co. v. Tioga Southeastern Ry. Co.,* 6 ICC 323.

"Point-to-point" rates that is, rates having application from a designated point of origin to a designated point of destination, are not new or novel but, rather, have been used in the field of carrier rate-making, although

sparingly, over a long period of time. Such rates were approved in the early case of *Interstate Commerce Commission v. Alabama Midland Ry. Co.* (1897), 168 U. S. 144, 18 S. Ct. 45, 42 L. Ed. 414. Although such rates have not been in general use in South Carolina, there is no prohibition against the use of such rates and the South Carolina Public Service Commission may in the proper exercise of the authority delegated to it by the General Assembly make reasonable rates on a point-to-point basis, provided such rates are non-discriminatory.

Appellants contend that Section 58-1079(5), Code of Laws of South Carolina, 1962, will be violated by the allowance of point-to-point rates on articulated cars. It is therein provided that "It shall be unlawful for any such railroad to charge, collect or receive: * * * (5) from any person for the transportation of any freight upon its railroad a higher or greater rate * * * than it shall at the same time charge, collect or receive from any person for the transportation of a like quantity of freight of the same class being transported from the same point over equal distances of the same railroad; * * *."

Appellants point out that two ordinary 50-ton hoppers coupled together in the normal way can be and actually are being loaded at any quarry or pit where the articulated car can be loaded and are being transported over equal distances of the Southern Railway System but are charged the much higher, normal rates.

This position is without merit in view of the Commission's Report which provides that "It is further ordered, That if, upon shipper's order, no articulated cars are available, the Southern Railway Company, be, and it hereby is, required to furnish in lieu thereof two (2) fifty-ton open hopper cars, with couplers immobilized for the trip, and protect the articulated car rates on the movement; * * *."

Point-to-point rates have application between a designated point of origin to a designated point of destination, and Appellants argue that intermediate

points are discriminated against as the published rates would have intermediate application between the point of origin and the point of destination, it being contended that the intermediate point would be required to pay the same rate as the point of origin, thereby violating Section 58-1079(1) of the Code which provides: "It shall be unlawful for any such railroad to charge, collect or receive: (1) For the transportation of * * * freight * * * upon its railroad for any distance within this State the same or a greater amount of toll or compensation than is at the same time charged, collected or received for the transportation of * * * a like quantity of freight of the same class over a greater distance on the same railroad; * * *."

The Commission's Report states: "* * * Though the points of origin and destination are relatively few, Southern has made it clear that it stands ready, with our approval, to accord any other aggregates shippers or receivers on its lines equal treatment. * * *"

No shipper or receiver on Southern's line has complained of discrimination nor is there any evidence indicating that the points were selected arbitrarily. On the contrary, it appears the points were selected because of the heavy volume of sand traffic between such points. The intermediate points between the point of origin and the point of destination are allowed the benefit of the reduced rate; however, such intermediate points have the right to offer evidence at a later date to show discrimination if such in fact may exist.

For the foregoing reasons we are of opinion that the Order appealed from should be affirmed, and it is so ordered. Affirmed.

Moss, Lewis and Brailsford, JJ., concur.

Bussey, J., did not participate.