**AD HOC TELECOMMUNICATIONS USERS COMMITTEE, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America,**

American Telephone and Telegraph Company, Aeronautical Radio, Inc., United States Transmissions Systems, Inc., American Hotel and Motel Association, Intervenors.

**AERONAUTICAL RADIO, INC. and Air Transport Association of America, Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America,**

American Hotel and Motel Association, Aerospace Industries Association of America, Inc., International Communications Association, American Telephone and Telegraph Company, Telecommunications Association, Intervenors.

**AMERICAN PETROLEUM INSTITUTE, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America,**

American Telephone and Telegraph Company, Aerospace Industries Association of America, Inc., Intervenors.

Nos. 80–1785, 80–1876 and 80–2093.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 28, 1981.

Decided June 11, 1982.

Joseph M. Kittner, with whom Edward P. Taptich, Washington, D. C., was on the brief, for Ad Hoc Telecommunications Users Committee, petitioner in 80–1785.

Charles R. Cutler, John L. Bartlett, Michael Yourshaw, Robert J. Butler and James E. Landry, Washington, D. C., were on the brief for Aeronautical Radio, Inc., petitioner in 80–1876 and intervenor in 80–1785.

Wayne V. Black, Larry S. Solomon, Stark Ritchie, David E. Lindgren, and Sheila A. Millar, Washington, D. C., were on the brief for American Petroleum Institute, petitioner in 80–2093.

John J. Loflin, with whom Jack P. Jefferies, and David P. Ballard, New York City, were on the brief, for American Hotel and Motel Ass'n, intervenor in 80–1785 and 80–1876.

Charles Lister, Washington, D. C., with whom Alfred A. Green, and Francine J. Berry, New York City, were on the brief, for American Tel. and Tel. Co., intervenor in 80–1785, 80–1876, and 80–2093.

Arthur Scheiner and Michael H. Rosenbloom, Washington, D. C., were on the brief for Aerospace Industries Ass'n of America, Inc., intervenor in 80–1785, 80–1876, and 80–2093.

Michael D. Sullivan, Counsel, F.C.C. with whom Stephen A. Sharp, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, John E. Ingle, Deputy Associate Gen. Counsel, and Jack David Smith, Counsel, F.C.C., Washington, D. C., were on the brief, for respondent, F.C.C. Jane E. Mago, Counsel, F.C.C., Washington, D. C., also entered an appearance for respondent, F.C.C.

Robert B. Nicholson, Peter L. de la Cruz, James Laskey, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent, United States of America.

Lewis A. Rivlin and Robert J. Miller, Washington, D. C., entered appearances for Intern. Communications Ass'n, intervenor in 80–1876.

Before: ROBINSON, Chief Judge, MacKINNON and GINSBURG, Circuit Judges.

GINSBURG, Circuit Judge:

Petitioners and intervenors in this case provide, use or are otherwise interested in the availability of long distance telephone services known as Outward WATS and Inward WATS. They challenge a Federal Communications Commission (FCC or Commission) decision that each of these WATS services is "like" ordinary long distance telephone service for purposes of 47 U.S.C. § 202(a), which prohibits unjust or unreasonable discrimination in charges "for or in connection with like communication service." [1] The Commission emphasizes that its determination does not mandate elimination or alteration of WATS services. Rather, the FCC explains, if its decision is affirmed, "any rate discrimination or preference between [WATS and ordinary long distance service] must be clearly shown to be justified in accordance with applicable Commission rules and orders, and if not, the discrimination or preference must be elimi-

---

1. Section 202(a) provides:

It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with *like communication service*, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage. (Emphasis added.)

nated." [2] Petitioners and intervenors contend that, in making the "likeness" determination at issue, and adhering to it on reconsideration, the Commission failed to apply any ascertainable standard. They further assert that, in face of overwhelming record evidence to the contrary, the FCC's decision characterizing WATS and ordinary long distance as "like service[s]" was arbitrary and capricious.

The Commission purported to apply its judicially-approved "functional equivalency" test in arriving at the "likeness" determination before us for review. But the Commission's explanation slips from the grasp and, in the shape presented to us, does not satisfy the demands of cogent decisionmaking. Because the "functional equivalency" test is an important, still-evolving Commission approach, we do not believe it appropriate to cut off at this juncture the FCC's opportunity to define comprehensibly the path it is taking. Accordingly, we vacate the Commission's orders and remand for a more precise determination of the "likeness" *vel non* of the services at issue.

## I.

The American Telephone and Telegraph Company (AT&T) operates a nationwide telecommunications system and offers several forms of long distance communication including ordinary long distance service and two distinct WATS services. Long Distance Message Telecommunications Service (MTS) is the familiar nationwide long distance service. It has two-way capability (placing and receiving calls) and may be accessed from almost any telephone at any time. It provides virtually world-wide service. Operator assistance is available for special service features, including collect, credit card, conference, person-to-person, and third-party-billed calls. Subscribers are provided a detailed bill which itemizes the charges for each call period.

Wide Area Telecommunications Service (WATS), on the other hand, is a one-way-only calling or receiving service covering specified geographical areas. The WATS services in question are of two kinds: Outward WATS and Inward WATS (the latter commonly called "800" Service).

Outward WATS, first introduced in 1961, permits high-volume users to place direct-dialed calls anywhere within a designated service area at a fixed monthly rate. Outward WATS calls proceed over a unidirectional access line from the subscriber's phone to a specifically equipped WATS central office. At this location the calls are switched onto the interstate long distance telephone network, known as the public switched network, the same network over which regular long distance calls travel. At the WATS central office a screening and blocking function occurs which accepts only calls to the designated geographic area covered by the subscription. Outward WATS customers subscribe to coverage selected from among five service areas within the United States, none of which includes the subscriber's home state.[3] These areas may be viewed as five concentric circles of increasing size. The larger the size of the service area selected, the higher the rate charged.

Inward WATS (800 Service), first introduced in 1967, operates in a manner essentially the reverse of Outward WATS. It permits the subscriber to receive direct-dialed calls, originating from within the selected service area, on a collect basis at a fixed monthly rate. Inward WATS calls first traverse the public switched network and then are blocked and screened at the terminating WATS office serving the subscriber. Inward WATS also requires the use of separate access lines to carry the calls from the central office to the subscriber. The special WATS access lines cannot be used for placing or receiving any other type of calls.

---

**2.** American Tel. & Tel. Co. (WATS), 70 F.C. C.2d 593, 603 (1978) (*Like Services Decision*).

**3.** Intrastate WATS service is generally available for subscribers whose intrastate toll calling volumes warrant such subscription. *See id.* at 595 n.4.

The fixed monthly fees for both WATS services are prepaid. If WATS services of either character are used in excess of the time periods paid for, additional charges are billed. The itemized billing statement characteristic of MTS is not a feature of either WATS service.

On September 26, 1977, the Commission released a Notice of Inquiry in which it solicited comments on the question whether Outward WATS or Inward WATS constitutes service "like" MTS within the meaning of section 202(a). *American Telephone & Telegraph Co. (WATS)*, 66 F.C.C.2d 224, 226 (1977) (*Notice of Inquiry*). The Commission also solicited comments on the specific standards or criteria it should rely upon in making "likeness" determinations. *Id.* After evaluating the numerous responses received, the Commission discarded differences in service it deemed "irrelevant" and concluded that both WATS services are "like" MTS for section 202(a) purposes. *American Telephone & Telegraph Co. (WATS)*, 70 F.C.C.2d 593 (1978) (*Like Services Decision*).

The Commission stated that, in reaching its decision, it employed the "functional equivalency" test, which focuses on whether the services under consideration differ in any material functional respect. *Id.* at 604. The FCC concluded here that "no difference exists between the services in terms of [the] communication functions performed for the subscriber." *Id.* at 605. The Commission asserted that it arrived at this conclusion after examining, through review of comments submitted by subscribers, customer perception of the various services, which the FCC "believe[s] to be a major test of functional equivalency." *Id.* at 609 (footnote omitted).[4] The Commission also pointed to the undisputed fact that the transmission of MTS and WATS calls from end-to-end within the public switched network is essentially identical. *Id.* at 605. Based on its "like service" finding, the FCC ordered AT&T either to demonstrate the lawfulness of its discriminatory charges or to eliminate them. *Id.* at 614–15.

On July 15, 1980, the Commission released a Memorandum Opinion and Order in *American Telephone & Telegraph Co. (WATS)*, 79 F.C.C.2d 10 (1980) (*Like Services Reconsideration*), denying petitions for reconsideration of the *Like Services Decision*. The Commission reaffirmed its position that both WATS services are functionally equivalent to MTS service because they use the same interstate network and "offer the same telephone calling capability from the standpoint of the customer." *Id.* at 12.[5] The Commission also responded to the charge that its "likeness" finding with re-

---

4. *After reciting the various service features and operational characteristics proffered by petitioners and intervenors as distinguishing MTS from WATS, the Commission declared that "none of these factors militate against the fact that one service is essentially identical to the other in terms of communications function performed for the subscriber." Id. at 607 (emphasis added). The FCC therefore concluded that these factors were irrelevant to the 202(a) "likeness determination." Among the factors the Commission deemed irrelevant were the screening and blocking functions, id. at 608; the unidirectional WATS access lines, id.; the absence of operator assistance in placing Inward WATS calls, id. at 611; and other special service features of MTS including person-to-person, collect, credit card, third-party billing, and conference calls which an Outward WATS subscriber would continue to receive through regular telephone line service at MTS rates. Id. Although it regarded these features as controlled and arranged by AT&T to segment the telecommunications market for pricing pur-*

poses, *id.* at 605–06, the Commission acknowledged that such features would be relevant in the proper rate-making context. *Id.* at 604 n.14. *See American Tel. & Tel. Co.*, 59 F.C.C.2d 671, 684–86 (1976), *recon.*, 64 F.C.C.2d 538 (1977) (Commission determined, in context of 47 U.S.C. § 201(b)'s requirement that all charges for communication service be "just and reasonable," *see infra* note 6, that Inward and Outward WATS must be priced separately because they provide different communication services, are functionally different, serve different subscriber communication needs, and use the public switched network in significantly different ways).

5. The FCC continued to deem irrelevant factors "totally under the control of AT&T," which, in the Commission's view, AT&T used to segment its market, but which did not "reflect fundamental differences in the functions [WATS and MTS] perform for their respective users . . . ." *Id.* at 12. *See supra* note 4.

spect to WATS and MTS conflicted with its earlier determination in *American Telephone & Telegraph Co.*, 59 F.C.C.2d 671 (1976), *recon.*, 64 F.C.C.2d 538 (1977), that Inward and Outward WATS were not like services. The two inquiries were discrete, the FCC maintains. The earlier ruling occurred in the context of a section 201(b) just and reasonable rate determination.[6] There, the Commission made no section 202(a) "like service" determination. It did not compare WATS and MTS; it found only that "Inward and Outward WATS, as offered by AT&T, were different service classifications" which must be cost-justified and priced independently. 79 F.C.C.2d at 13.

## II.

■ Court opinions have consistently recognized that the "functional equivalency" test is an appropriate method for determining "likeness" within the meaning of section 202(a).[7] *American Broadcasting Cos. v. FCC*, 663 F.2d 133, 138 (D.C.Cir.1980); *Western Union International, Inc. v. FCC*, 568 F.2d 1012, 1018 & n.11 (2d Cir. 1977), *cert. denied*, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978); *American Trucking Associations v. FCC*, 377 F.2d 121, 127, 129 (D.C.Cir.1966), *cert. denied*, 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967). This test, initially stated and developed by the Commission,[8] focuses on whether the services in question are "different in any material functional respect." *American Broadcasting Cos.*, 663 F.2d at 138; *American Trucking Associations*, 377 F.2d at 127. "The test looks to the nature of the services offered to determine likeness; the perspective of the customer faced with differing services is often considered a significant factor." *American Broadcasting Cos.*, 663 F.2d at 139.[9]

■ The Commission here, purporting to apply the functional equivalency test, determined that both Outward WATS and Inward WATS are services "like" MTS. In reaching this conclusion, the FCC relied dominantly on its view of customer perception of the three services [10] and on transmis-

---

**6.** 47 U.S.C. § 201(b) provides in relevant part:

All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: *Provided*, That communications by wire or radio subject to this chapter may be classified into day, night, repeated, unrepeated, letter, commercial, press, Government, and such ·other classes as the Commission may decide to be just and reasonable, and different charges may be made for the different classes of communications ....

**7.** As the opinion concurring in the result points out, the language of section 202(a) was adopted from various portions of the original Interstate Commerce Act, 24 Stat. 379, 379–80 (1887). Additionally, other regulatory statutes, which prohibit a shipper or carrier from unjustly discriminating, have been interpreted to forbid the shipper or carrier from charging different fares or rates for "like service." *See Aloha Airlines, Inc. v. CAB*, 598 F.2d 250, 263 (D.C.Cir.1979) (quoting Group Inclusive Tour-Basing Fares to Hawaii, 54 C.A.B. 434, 453 (1970)) (Federal Aviation Act); North Atlantic Mediterranean Freight Conference—Rates on Household Goods, 11 F.M.C. 202, 213 (1967) (Shipping Act). However, the parties have not cited, nor have we found, any agency or court decision interpreting the "like service" language of regulatory statutes other than the Communications Act in terms of a functional equivalency test. Because this agency-developed, court-approved test apparently has not evolved outside the Communications Act, the legislative history of, and the case law interpreting, other regulatory statutes is of limited value in elaborating the meaning of section 202(a)'s "like communication service" reference.

**8.** *See* American Tel. & Tel. Co. (TELPAK), 38 F.C.C. 370, 376 (1964), *aff'd sub nom. American Trucking Ass'ns v. FCC*, 377 F.2d 121 (D.C.Cir. 1966), *cert. denied*, 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967). *See also* American Tel. & Tel. Co. (Hi/Lo), 55 F.C.C.2d 224, 230 (1975), *aff'd mem. sub nom. Commodity News Services, Inc. v. FCC*, 561 F.2d 1021 (D.C.Cir.1977).

**9.** In support of this statement, *American Broadcasting Cos.* cites the FCC's *Like Services Decision*, 70 F.C.C.2d at 609, 614.

**10.** *See, e.g.*, 79 F.C.C.2d at 11, 12–13; 70 F.C.C.2d at 609, 614. The FCC reported receiving "extensive comments" from large WATS users but no comments from MTS customers. *See* 79 F.C.C.2d at 12 n.6. The Commission acknowledged that customer perception is incompletely gauged without "participation of [the] vast body of telephone ratepayers." *Id.*

sion technology.[11] The Commission did not separately apply the functional equivalency test to compare Outward WATS and MTS on the one hand, and Inward WATS and MTS on the other. Rather, the FCC, in this proceeding, essentially lumped together Outward and Inward WATS and swiftly declared WATS and MTS functional equivalents. But the failure to attempt distinct comparisons of each WATS service with MTS is not easily reconciled with the Commission's prior determination that Inward and Outward WATS "are functionally different and . . . serve different subscriber communication needs." *American Telephone & Telegraph Co.*, 59 F.C.C.2d at 685; *see supra* note 4. And it is far from apparent that users' perceptions support the FCC's blending of the two distinct WATS services.[12] It may be that the Commission settled for blurred analysis because it was reaching for more than a clearly focused "like service" determination would permit it to achieve.

■ In remanding this proceeding to the Commission, we affirm our prior declarations that the functional equivalency test, with customer perception as a linchpin,[13] is an appropriate standard for determining section 202(a) "likeness." Recognizing that it is the Commission's responsibility to elaborate the functional equivalency test, we state these few guides for sharpened analysis. First, the Commission should not blend discrete services in its application of the test. Second, the perceptions of users of each service under examination should be evaluated. Finally, alleged differences in the services compared should be considered. The Commission may well conclude, after consideration, that particular differences do not bear on "functional equivalency," but it should state comprehensively the reasoning upon which it relies to discard a difference as "irrelevant."[14]

11. *See, e.g.,* 70 F.C.C.2d at 605, 614. It may be an overstatement to assert, as the opinion concurring in the result does, that the Commission's "focus has been almost exclusively on *transmission technology.*" Concurring op. at 10 (emphasis in original). *See, e.g., Like Services Decision,* 70 F.C.C.2d at 609 ("we believe . . . customer perception . . . to be a major test of functional equivalency"); *Like Services Reconsideration,* 79 F.C.C.2d at 12 ("an important indicator of functional equivalency is customer perception"). Indeed, the petitions for reconsideration of the Commission's *Like Services Decision* charged that "the Commission erred in relying upon customer perception of functional equivalency as the 'only' test for 'like' services . . . ." *See* 79 F.C.C.2d at 11.

12. Underlying the Commission's discussion of customer perception, it appears, is a notion of the cross-elasticity of demand between WATS services and MTS. But the FCC, in the decisions under review, never makes this explicit. In contrast, prior and subsequent statements of the Commission expressly indicate the importance the FCC attributes to examining cross-elasticity of demand in evaluating the "likeness" of two products or services. *See, e.g.,* Regulatory Policies Concerning Resale and Shared Use of Common Carrier Domestic Public Switched Network Services, 83 F.C.C.2d 167, 175 n.22 (1980) ("By the same product, we are referring to the existence of significant cross-elasticities of demand . . . ."); American Tel. & Tel. Co., Long Lines Department, 67 F.C.C.2d 1134, 1167 (1978) (cross-elasticity of demand is "a useful index of . . . similarity").

We note the Commission's repeated observation that the cross-elasticity between MTS and Outward WATS is "pronounced." *See* American Tel. & Tel. Co., 84 F.C.C.2d 158, 179 n.46 (1980) (quoting American Tel. & Tel. Co., 66 F.C.C.2d 9, 31 (1977)); *Like Services Decision,* 70 F.C.C.2d at 596. Apparently no such determination has ever been made as to the cross-elasticity of Inward WATS and MTS.

13. Examination of cross-elasticity of demand may be a standard means for evaluating customer perception, a method with which the Commission is familiar. *See supra* note 12. There may be others. We leave to the Commission, in the first instance, the task of identifying the proper method for applying this critical concept, customer perception of functional equivalency.

14. The opinion concurring in the result cites *Western Union Int'l Inc. v. FCC,* 568 F.2d 1012 (2d Cir. 1977), *cert. denied,* 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978), and *American Trucking Ass'ns, Inc. v. FCC,* 377 F.2d 121 (D.C.Cir.1966), *cert. denied,* 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967), as support for its position that in this case the Commission arbitrarily characterized as "irrelevant" features that distinguish WATS from MTS. *See* Concurring op. at 808–809. But only limited mileage can be gained by negative inferences from cases that *affirmed the Commission's determination* that the services under examination were "like" within the meaning of section

### III.

■ Without attempting further suggestion of the inquiry and analysis the Commission might pursue on remand, we note some problematic facets of the opinion concurring in the result. That opinion initially embraces the functional equivalency test, then proceeds to define it virtually out of existence. Despite faint qualifications here and there, the opinion concurring in the result maintains that two services are not "like" unless they are, for all practical purposes, "identical." We are told, with the aid of Webster's, that there will be no "equivalency" unless "two things are 'identical.'" Concurring op. at 801. But emphasis on equivalence in derogation of function misses the mark. The focus of the test should be practical, oriented to customers: what function or need do customers perceive to be satisfied by the services under examination? If customers perceive that two services perform the same function, price will govern choice. Sensibly, the functional equivalency test should be allowed to yield a determination that these services are "like," whether or not they are "identical," [15] and we so hold.

In elaborating its notion of the "functional equivalency" test, the opinion concurring in the result tenders a subset analysis as a central element. It suggests that if one service is only a subset of the other, the two are not readily classified as "functionally equivalent," or "like." For, "in order to be functionally equivalent, the two services must possess virtually all the same qualities of (and be capable of being employed for the same uses as) the other while neither possesses significant qualities (or uses) the other lacks." Concurring op. at 804. Applying this analysis to the instant case, the opinion concurring in the result indicates that because WATS service cannot do everything MTS is able to do, neither WATS service can be "like" MTS. Id. at 804–805.

The proffered subset analysis turns sharply away from our Circuit's most recent precedent in point. In American Broadcasting Cos., this court, approving the FCC's functional equivalency determination, upheld a Commission decision that AT&T's full- and part-time television broadcast service categories were "like communication service" under section 202(a). Plainly, part-time video transmission service is a subset of full-time service, and the opinion concurring in the result so acknowledges. Concurring op. at 805. Equally beyond debate, a full-time service user could not substitute part-time service and receive the same "package of benefits, rights, restrictions, duties, facilities and services ...." See id. at 804. Since the opinion concurring in the result would hold that the word "service" as it is used in section 202(a) means "entire package," [16] and nothing less, and generally describes subsets as unlike the larger package, we find the tendered analysis dissonant with American Broadcasting Cos.[17] Our deci-

202(a). Neither decision is instructive as to which factor or combination of factors represents a *material* functional difference. Nor do these cases indicate the degree of functional variance the Commission or courts will countenance and yet pronounce the two services "like."

15. *Cf. American Broadcasting Cos.*, 663 F.2d at 139 & n.13. As this court recognized, distinctions between "like" services may be reflected in the prices of those services. *Id.* at 139 & n.13; *see also supra* pp. 4, 7–8 & n.4. However, section 202(a)'s prohibition against "unjust or unreasonable discrimination" requires that such price variations be justified by cost differentials or competitive necessity. *American Broadcasting Cos.*, 663 F.2d at 139; *Western Union*, 568 F.2d at 1019 n.15.

16. Concurring op. at 804.

17. The opinion concurring in the result attempts to distinguish *American Broadcasting Cos.* on the ground that "the Commission neither found [the] particular time use restriction [in that case] nor [the] different dedicated facilities to constitute *material* functional differences." Concurring op. at 805 (emphasis in original). Curiously, the opinion concurring in the result gives scant weight to the fact that the Commission did not find differences between WATS service and MTS service to be material functional differences. It is hardly apparent why the opinion concurring in the result accepts the time use restrictions in *American Broadcasting Cos.* as not material, but seems to regard the geographical restrictions in connection with WATS service as ma-

sion, in contrast, like the one in *American Broadcasting Cos.*, continues genuine approval of the Commission's "functional equivalency" test and allows for further development and refinement of the Commission's approach to "like service" determinations.

## CONCLUSION

Because the Commission has not adequately explained why it determined that, in the context of 47 U.S.C. § 202(a), both Outward WATS and Inward WATS provide communication service "like" MTS and, particularly, has not clarified a critical concept it claims to employ—customer perception of functional equivalency—we vacate the orders on review and remand for such further proceedings, consistent with this opinion, as the Commission may wish to pursue.

*It is so ordered.*

MacKINNON, Circuit Judge (concurring in the result):

I concur in the majority's decision to vacate these orders on review and remand them to the Federal Communications Commission (the Commission) for further proceedings, but I disagree with the reasoning employed by the majority to arrive at that result.

The Commission asserts that it relied upon customer perception, which it views as a major test of functional equivalency, in determining that Outward WATS service and Inward WATS service are "like communication service[s]" to ordinary long-distance telephone service for purposes of 47 U.S.C. § 202(a) (1976).[1] The Commission also claims that it considered *all* the rele-

terial. *See* Concurring op. at 804–805 n.12. Again relying on the FCC, the opinion concurring in the result reports that in *American Broadcasting Cos.* part- and full-time users "apparently received identical transmission service." Concurring op. at 802. As this court noted, however, the two services at issue in *American Broadcasting Cos.* employed different physical facilities. 633 F.2d at 139 n.13.

1. 47 U.S.C. § 202(a) provides:
   It shall be unlawful for any common carrier to make any unjust or unreasonable discrimi-

vant factors in making its determination but admits to having disregarded information it believed to be irrelevant. In my opinion the Commission's decision was arbitrary and capricious because each of those assertions is untenable. First, the Commission did not rely upon customer perceptions, rather it relied "dominantly on *its view* of customer perception." At 795 (emphasis added). The Commission evaluated the customer input with a preconceived bias that caused it to interpret, discount or ignore the comments in such a manner as to make them consistent with its own views.

Second, the Commission did not consider all the relevant factors in making its likeness determination. It concedes that it disregarded what it deemed to be irrelevant comments and submissions. By arbitrarily and narrowly circumscribing the scope of relevant factors, the Commission at the outset foreordained the result later reached.

Because I conclude that the Commission's failure to consider all the relevant factors and its slanted interpretation of customer perception resulted in a finding of "like communication service" which was contrary to the weight of evidence in the record, I concur in the decision to vacate and remand.

### I.

The American Telephone and Telegraph Company (AT&T) operates a nationwide telecommunications system and offers several forms of long distance communication: ordinary long distance service and two separate WATS services. Long Distance Message Telecommunications Service (Long

nation in charges, practices, classifications, regulations, facilities, or services for or in connection with *like communication service*, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage. (Emphasis added).

Distance) is the familiar nationwide long distance service. It has *two-way* capability (placing calls and receiving calls) and may be accessed from almost any telephone at any time. It provides virtually worldwide service. Operator assistance is available on Long Distance for special service features, including collect, credit card, conference, person-to-person, and third party billed calls. Subscribers are provided a detailed bill which itemizes the charges for each call placed.

Wide Area Telecommunications Service (WATS), on the other hand, is a one-way-only calling or receiving service covering specified geographical areas. These WATS services are of two kinds: Outward WATS and Inward WATS (the latter commonly being referred to as "800" Service).

Outward WATS, first introduced in 1961, permits high-volume users to place direct-dialed calls anywhere within a designated service area at a fixed monthly rate. Outward WATS calls proceed over a unidirectional access line from the subscriber's phone to a specially equipped WATS central office. At this location the calls are switched onto the interstate long distance telephone network, known as the public switched network, the same network over which regular long distance calls travel. At the WATS central office a special screening and blocking function occurs which only accepts for outward handling calls to the designated geographic area that is covered by the subscription. Outward WATS customers subscribe to coverage selected from among five service areas which may be viewed as five concentric circles of increasing size. The larger the size of the service area selected, the higher the rate charged. Outward WATS does not allow the placing of intrastate or overseas calls.

Inward WATS (800 Service), first introduced in 1967, operates in a manner essentially the reverse of Outward WATS. It in effect permits the subscriber to receive direct-dialed calls, originating from within the selected area, on a collect basis at a fixed monthly rate. Unlike Outward WATS calls, Inward WATS calls first tra-

verse the public switched network and then are blocked and screened at the terminating WATS office serving the subscriber. Inward WATS also requires the use of *separate access lines* to carry the calls from the central office to the subscriber. These special WATS access lines cannot be used for placing or receiving any other types of calls.

The fixed monthly fees for both WATS services are prepaid. If WATS services of either character are used in excess of the time periods paid for, additional charges are billed. The itemized billing statement which is characteristic of Long Distance is not furnished to customers of either type of WATS service.

On September 26, 1977 the Commission released a Notice of Inquiry in which it solicited comments from interested parties on the question of whether Outward WATS or Inward WATS, respectively, constitutes service "like" Long Distance within the meaning of section 202(a). *American Telephone & Telegraph Co. (WATS),* 66 F.C. C.2d 224, 226 (1977) (*Notice of Inquiry*). The Commission also solicited comments on the specific standards or criteria it should rely upon in making "likeness" determinations. *Id.* The Commission received numerous responses, many specifically addressing the question of whether customers perceive WATS services as being different from other services in terms of the communication needs they meet. After evaluating the comments received, the Commission set aside what it deemed to be irrelevant considerations and concluded that both WATS services are "like" services to Long Distance within the meaning of section 202(a). *American Telephone & Telegraph Co. (WATS),* 70 F.C.C.2d 593 (1978) (*Like Services Decision*).

In reaching this conclusion the Commission employed a "functional equivalency" test which focused on whether WATS and Long Distance differ in any material functional respect. The Commission asserted that from the standpoint of the subscriber there was no clear difference between the communication functions of either WATS service and Long Distance because the actu-

al *transmission* of Long Distance and WATS calls from end to end within the public switched network was essentially identical. *Id.* at 605. The Commission viewed the various service features and operational characteristics distinguishing Long Distance from WATS as mere devices designed to segment the telecommunications market for pricing purposes. *Id.* at 605–06. Although the Commission believed that certain service features and operational characteristics were only related to price, and therefore irrelevant to a determination of likeness, it did acknowledge that such considerations would be relevant in the proper ratemaking context under 47 U.S.C. § 201(b) (1976).[2] *Id.* at 604 n.14. Some of the factors the Commission deemed *irrelevant* were the screening and blocking functions, *id.* at 608; the limited geographic coverage feature, *id.*; the unidirectional WATS access lines, *id.*; the absence of operator assistance in placing Inward WATS calls, *id.* at 611; and other special service features including person-to-person, collect, credit card, third party billing and conference calls. *Id.* As a result of the Commission's finding of *like service*, it ordered AT&T to either demonstrate the lawfulness of its discriminatory charges or to eliminate them. *Id.* at 614–15.

On July 15, 1980 the Commission released a ˙ Memorandum Opinion and Order in *American Telephone & Telegraph Co. (WATS)*, 79 F.C.C.2d 10 (1980) (*Like Services Reconsideration*), denying petitions for reconsideration of the *Like Services Decision*. The Commission reaffirmed its position that both WATS services are functionally equivalent to ordinary two-way Long Distance service because they use the same interstate network and "offer the same telephone calling capability from the stand-

point of the customer." *Id.* at 12. The Commission continued to deem as irrelevant cost differences, WATS switching equipment and unidirectional access lines. Finally, the Commission responded to the allegation that its finding that WATS and Long Distance are like services conflicted with its earlier determination in *American Telephone & Telegraph Co.*, 59 F.C.C.2d 671 (1976), *recon.* 64 F.C.C.2d 538 (1977) that Inward WATS and Outward WATS are "unlike" services.[3] It claimed that the cases were distinguishable on the ground that the earlier finding was based on a section 201(b) just and reasonable determination and did not involve a section 202(a) likeness determination.

## II.

A review of the Commission's likeness determination must comply with the general provisions of the Administrative Procedure Act, 5 U.S.C. § 706 (1976), governing judicial review of agency action.[4] *American Broadcasting Cos. v. FCC*, 663 F.2d 133, 138 (D.C.Cir.1980).

Petitioners and intervenors argue that the functional equivalency test as applied by the Commission did not consider all the relevant factors relating to the nature and character of the *services* being considered. The Commission freely admits that it "stripped" from the record certain information which it deemed to be irrelevant to a determination of likeness. *Like Services Decision, supra* at 604–05. Hence, the pivotal question on review is whether the Commission considered all the relevant factors in its application of the functional equivalency test to this case.

## III.

This court recently summarized the functional equivalency test as follows:

---

**2.** 47 U.S.C. § 201(b) provides:

All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: ....

**3.** In this case the FCC held: "The two services [Inward and Outward WATS] are *functionally*

different and they serve different subscriber communication needs." 59 F.C.C. at 685.

**4.** 5 U.S.C. 706(2)(A), (E) require a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be— (A) arbitrary, capricious, an abuse of discretion, or ... (E) unsupported by substantial evidence ...."

Section 202(a) prohibits "unjust or unreasonable discrimination in charges" in the provision of "like communication services." 47 U.S.C. § 202(a). Under this provision, the Commission first determines whether the services are "like." This question is decided on a case-by-case basis. *Western Union International, Inc. v. FCC*, 568 F.2d 1012, 1018 n.11 (2d Cir. 1977), *cert. denied*, 436 U.S. 944 [98 S.Ct. 2845, 56 L.Ed.2d 785] ... (1978); *American Telephone & Telegraph Co. (WATS)*, 70 F.C.C.2d 593, 613–14 (1978).

A standard means for determining "likeness" is the functional equivalency test. Under this test as developed by the Commission, the inquiry centers on whether the services are "different in any material functional respect." *American Trucking Associations, Inc. v. FCC*, 377 F.2d 121, 127 (D.C.Cir.1966), *cert. denied*, 386 U.S. 943 [87 S.Ct. 973, 17 L.Ed.2d 874] ... (1967). The test looks to the nature of the services offered to determine likeness; the perspective of the customer faced with differing services is often considered a significant factor. *See American Telephone & Telegraph Co. (WATS)*, 70 F.C.C.2d 593, 609 & 614 (1978).

*American Broadcasting Cos. v. FCC, supra* at 138–139 (footnote omitted). The functional equivalency test continues to be the proper standard to be employed in making likeness determinations and such determinations may be approached on a case-by-case basis. *Id.* at 138.

The functional equivalency test, originated by the Commission, was adopted by this court as the test for likeness determinations. It focuses on whether two services differ in any material functional respect. In other words, the closeness of the fit between the qualities and attributes of the two services must be measured. The degree of variance that will be tolerated before a difference becomes material is left to the sound discretion of the Commission and is to be determined in accordance with the controlling statutory and case law. It is not the role of this court to quantify for the Commission the degree of difference in communications services that is to be allowed before two services lose their likeness, but it can be said with some assurance that the permissible degree of difference is limited.

Some idea of the permissible degree of difference may be gleaned by examining the words the Commission has selected to describe its test for likeness: "functional equivalence." In this context, the word "functional" means performing or able to perform its regular function or functions. The word function in turn commonly refers to "the action[s] for which a person or thing is specially fitted, used or responsible or for which a thing exists." [5] There are generally multiple uses or purposes for which any communication service can be employed.

The word "equivalent" expresses the notion that two terms, be they abstract or tangible, each possess *virtually all* of the qualities or attributes of the other. "Equivalence" is thus distinguished from mere "similarity," which only indicates a sharing of *some* attributes or properties. Stated otherwise, in order to be equivalent two terms must possess virtually all the same *material* qualities of the other while neither possesses *significant* qualities the other lacks. Hence, to say that two terms are "equivalent" [6] expresses the same idea commonly intended by the statement that two things are "identical." [7]

This court's 1980 decision in *American Broadcasting, supra*, holding that the Commission properly applied the functional

---

**5.** Webster's Third New International Dictionary (1963).

**6.** The word "equivalent" is defined to mean "corresponding or *virtually identical in* effect or *function.*" *Id.* (emphasis added).

**7.** The word "identical" is defined to mean "being the same; having complete identity ...

showing exact likeness: *characterized by such entire agreement in qualities and attributes that identity may be assumed* ... very similar: *having such close resemblance and such minor difference as to be essentially the same*: appearing or seeming exactly alike ...." *Id.* (emphasis added).

equivalency test, rested upon this understanding of "function" and "equivalence." There the Commission was faced in part with the question of whether part- and full-time video transmission services are "like communication *service*." (Emphasis added). In concluding that they were, *the Commission noted* that "[i]t is apparent from an examination of the face of AT&T's tariff and this filing that full time and part time users receive the *identical transmission service.*" *American Telephone and Telegraph Co.*, 67 F.C.C.2d 1134, 1167 (1978) (emphasis added).[8] In terms of "function," the needs, uses or purposes for which consumers purchased the transmission service were the same. The Commission accordingly observed that AT&T had made "no relevant claim that the character of the video transmission service provided to full- and part-time users, respectively, differs in terms of meeting their broadcast transmission needs or that they [were] perceived by users as inherently different functionally." *Id.* at 1166. Indeed AT&T conceded that customers perceived the two services to be the same in all respects except their respective prices. *Id.*

In upholding the Commission's determination, this court stated that the Commission's proceeding had "produced adequate airing of the relevant factors" and its conclusion was supported by substantial evidence. *American Broadcasting, supra* at

138. Under the circumstances of that case where part- and full-time users apparently received identical transmission service and, according to AT&T's own admission, made decisions about service solely on the basis of price, there could be little dispute that like services were involved.

In the instant case the Commission openly admits that it disregarded certain information because it deemed it to be irrelevant to a likeness determination. *Like Services Decision*, 70 F.C.C.2d at 604–05; *Like Services Reconsideration*, 79 F.C.C.2d at 12. Petitioners and intervenors claim that the alleged "irrelevancies" relate directly to the nature and character of the communication services in question and therefore should have been considered by the Commission. The validity of the Commission's likeness determination ultimately turns on the question of whether it considered all the relevant factors.

The disagreement in this case over the factors relevant to a determination of likeness arises because the Commission has strayed from the language and legislative intent of section 202(a). It is readily apparent from the Commission's *Like Services Decision* and *Like Services Reconsideration* that its focus has been almost exclusively upon *transmission technology*, particularly as it operates within the private switched network.[9] The Commission's position is es-

**8.** It should be emphasized here that the Commission used the word "identical" to characterize the degree of likeness between the two services.

Besides the primary difference of full- vis-a-vis part-time service, another technical distinction between the two services is that they used different facilities. However, the difference was one of dedicated use, not *type* of facility.

**9.** In an effort to enlighten parties about its policy governing the "functional equivalency" test, the Commission offered the following summary of the primary factors it considers in making likeness determinations:

42. The obvious starting point for our analysis was to examine the technological configuration of the overall public switched network. Once the technical underpinning of the network was considered, it was necessary to look at the operational characteristics of the particular services in question to deter-

mine exactly how AT&T offers MTS [Long Distance] and WATS services over the network. An examination of these operational characteristics helped shed light on the kinds of subscribers AT&T is attempting to attract to a particular tariffed service, and thus the communication requirement a subscriber seeks to have satisfied. We then examined the capabilities of the network, independent of how AT&T has chosen to permit its use, in order to determine whether and to what extent public switched network subscribers could have their communications requirements met under the MTS tariff or the WATS tariff, exclusively, or under either tariff, irrespectively. Finally, we considered whether they could be satisfied through a use of the network not now permitted by AT&T. Our rationale was that if subscribers could have their needs satisfied equally well under either tariff, or through network uses not allowed by AT&T, then any alleged service distinc-

sentially that any call which traverses the public switched network is a communication service *like* Long Distance for purposes of section 202(a). The Commission has tried to equate the narrow notion of use of the same *transmission path* with the broader concept of the "services" being furnished. As a result it erroneously concluded that Long Distance and both WATS services are "like" merely because they share the common feature of traversing the same interstate circuit. Otherwise stated, it holds that every long distance service is like every other long distance service because they both use long distance facilities. This myopic view overly emphasizes the similarity in the physical equipment employed by the services and ignores the essential differences in the character and extent of the *services* rendered and the perception of those services as viewed by the subscribers and users.[10]

If the Commission's statutory charge were to focus exclusively on transmission technology as it operates within the physical property of the public switched network, then there would be little question that the Commission has considered all the relevant factors and has acted properly in this case.

The governing statute, however, prohibits any common carrier from making "any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities or services for or in connection with *like* communication *service,* directly or indirectly." 47 U.S.C. § 202(a) (1976) (emphasis added). The statute also prohibits common carriers from giving "any undue or unreasonable preference or advantage to any particular person, class of persons, or locality." *Id.* The clear thrust of this statute is to prohibit any discrimination, preference or advantage by a carrier in favor of one customer over his competitors if all of them are seeking to purchase the same or a like communication *service.*

The word "service" should be given its full meaning which *inter alia* includes supplying any needs that are in general demand for accommodation of consumers to promote the use of all communication facilities that are available. The word "service" as it is used in section 202(a) refers to the entire package of benefits, rights, restrictions, duties, facilities and services contracted for between the customer and the communications carrier and is not restricted to the physical facilities that are used in long

---

tions between MTS and WTS [sic] were likely to be illusory. Bearing on this final analysis was our consideration of the perceptions of subscribers, *e.g.,* whether they view MTS and WATS services as replacements for each other or as inherently different communications services. Employing a balancing process, our study of the above factors led us to conclude that MTS and WATS are "like communications service."
*Like Services Decision, supra* at 614.

**10.** As noted earlier, a significant factor in the Commission's functional equivalency test is customer perception. The Commission received numerous comments and letters from users and summarized the substance of those submissions in its *Like Services Decision, supra* at 601–02. The users' comments and letters mentioned pricing and management procedures, the absence of operator involvement, the lack of alternative billing arrangements, direct computer-to-computer communication, cost savings to AT&T, customer antipathy toward use of collect MTS calling, innovative new programs dependent upon Inward WATS, quicker call completion with Inward WATS than with MTS, and so forth.

The Commission acknowledged these customer perceptions, but concluded that "the users' view of Inward WATS service chiefly concerns creating new business opportunities inexpensively by encouraging consumers to use its convenience and prepaid features to place orders that otherwise would not be obtained." *Id.* at 610. I do not agree that customer perception was that limited. The Commission also concluded that in Outward WATS "the service saves the subscriber money by lowering overall communications, administrative and sales expenses." *Id.* Implicit in these conclusions is the finding that the customers' perceptions did not relate to functional communications differences but were related to price and therefore could be ignored as being irrelevant to a likeness determination. However, a mere itemization of the customer perceptions, *supra,* indicates that the Commission has mischaracterized the results of the comments received. That many comments on *service* were directed at services that had some involvement with price does not justify the Commission ignoring the *service* features.

distance calls. When a customer purchases telephone service from a carrier, it contracts for not only the actual transmission of its communications over telephone circuits, but also for the use and convenience of all facilities and services incidental to that communications transmission. The mere fact that WATS and Long Distance calls traverse the public switched network in nearly identical fashion does not necessarily make the three *services* identical. In order for Long Distance and both WATS services to be found "like" within the meaning of section 202(a), the facilities, operating restrictions, and *services* incidental to Long Distance and· WATS transmissions should be substantially *equivalent*, not merely *similar* in a limited respect *i.e.*, physical transmission. In making that determination, the Commission should apply the functional equivalency test so as to encompass *all* the material aspects of the two services in question, not just the physical transmission function which they obviously have in common.

·By construing the word "service" more broadly than the Commission has in this case, I do not suggest that minor or immaterial differences [11] between·two services— no matter how numerous—are sufficient to render services, otherwise functionally equivalent in all *material* respects, "unlike." The point simply is that these various aspects of the word "service" are *relevant* to a likeness determination.

In this case, Long Distance offers the full range of telephone service features and capabilities generally available, including those available to WATS users. The WATS services, on the other hand, are in effect a *subset* of Long Distance, because they offer the customer only some of the service features and communication capability of Long Distance.

Given this subset relationship of WATS to Long Distance, it is true that whatever service features or communications capabilities are available through WATS will also be available through Long Distance. However, the fact that a customer may be able to substitute Long Distance for WATS and do everything with a Long Distance phone that one can do with a WATS phone does not make those services *functionally equivalent*. In order for WATS and Long Distance services to be functionally equivalent, a customer must also be able to substitute WATS for Long Distance and be able to do everything with a WATS phone that one can do with a Long Distance phone. As noted above, in order to be functionally equivalent, the two services must possess virtually all the same qualities of (and be capable of being employed for the same uses as) the other while neither possesses significant qualities (or uses) the other lacks. This point is effectively illustrated by drawing an analogy to track and field competitors. One surely would not argue that a track athlete who only runs the 100 yard dash is "functionally equivalent" to a decathlon competitor because the two athletes use the same track for their respective 100 yard dash races.[12]

**11.** In today's highly competitive markets for goods and services many real and imagined distinctions are drawn between competing *goods or services to attract consumers*. This marketing strategy involves product differentiation which is defined as "[t]he creation of real or imagined differences in essentially the same type of product, by means of branding, packaging, advertising, quality variation, design variation, etc." G. Bannock et al., Penguin Dictionary of Economics 115 (1977). The Commission should not permit analogous minor differences *between services in the communications industry to prevent a determination of likeness.*

**12.** Consider the following example. Assume that a large, wholesale merchandiser located in Atlanta subscribes to Outward WATS service ·

for a geographic area roughly encompassing the Southern United States *and* has no Long Distance service. If its Outward WATS service were then replaced by regular Long Distance service, it would be able to make the exact same calls it could have made with Outward WATS—and many additional types of calls that it could not have made earlier. However, the opposite does not hold true. If the same merchandiser originally had Long Distance service and decided to replace it with *only* Outward WATS service, it would enjoy only a fraction of the service features and calling capability that it previously possessed. The merchandiser's personnel would be unable to call Honolulu or London; they would be unable to place a *collect call to Miami; they would be*

This reference to subset relationships could create confusion if not properly understood. In a technical sense, any variance whatsoever in the benefits, use restrictions, or facilities of two services could be said to make one service a subset of the other. For example, in *American Broadcasting, supra,* an obvious time use restriction and different "dedicated" facilities distinguished the part-time video transmission service from the full-time service. The part-time service was clearly a subset of the full-time service, but the important point is that the Commission neither found that particular time use restriction nor different dedicated facilities to constitute *material* functional differences. Again, the critical determination is deciding how much variance between two services (the whole set and the subset) will be allowed before the difference is deemed to be material.

The pre-paid, flat rate, restricted, one-way service of Outward WATS (or Inward WATS) without any operator assistance does not constitute a service *like* Long Distance which furnishes monthly itemized bills, two-way unrestricted ordinary long-distance calls, full operator assistance, use of credit cards, third-party billing, collect calls, person-to-person calls, conference calls, and interstate and overseas calls. These differences constitute material functional differences. Subscribers of WATS services do not come close to enjoying the same package of service features and communication capability furnished by Long Distance service.

The legislative history of the Communications Act of 1934, Pub.L.No. 73–416, 48 Stat. 1064, supports this interpretation of the standard of comparison. It shows that the language of section 202(a) was drawn from provisions of the Interstate Commerce Act which prohibited discrimination by common carriers against any customers who were purchasing the same service under substantially similar circumstances and conditions. At the time Congress decided to incorporate the provisions of the Interstate Commerce Act into section 202(a) of the 1934 Act, the long established judicial interpretation of the "unjust discrimination" language was that competing customers had to be seeking substantially the same specific service, not merely the same general type or class of service.[13] The focus was particularized, not generic.

Both the Senate and House Reports on S. 3285, which became the basis for the Communications Act of 1934, state in their analyses of the bill that section 202 combines the language from sections 2 and 3(1) of the Interstate Commerce Act S.Rep.No. 781, 73d Cong. 2d Sess. at 4 (1934); H.R. Rep.No.1850, 73d Cong.2d Sess. at 5 (1934). Section 2 of the Interstate Commerce Act stated prior to its recodification in 1978:[14]

If any common carrier subject to the provisions of this chapter shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered or to be rendered, in the transportation of passengers or property, subject to the provisions of this chapter, than it charges, demands, collects, or receives from any other person or persons *for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances*

---

unable to obtain information about the precise cost of a call to a client in St. Louis; they would be unable to receive a collect call from an employee stranded at the airport in New York City; and they would be unable to join in conference calls with fellow merchandisers located in Chicago and Los Angeles. This simple example, when viewed from both perspectives, clearly reveals the material *functional* differences that distinguish Long Distance service from Outward WATS service.

13. *See, e.g., ICC v. Alabama Midland Ry. Co.,* 168 U.S. 144, 165–67, 18 S.Ct. 45, 48–49, 42 L.Ed. 414 (1897); *Wight v. United States,* 167 U.S. 512, 517–18, 17 S.Ct. 822, 823–24, 42 L.Ed. 258 (1897); *ICC v. Baltimore & O.R. Co.,* 145 U.S. 263, 281–82, 12 S.Ct. 844, 849–50, 36 L.Ed. 699 (1892).

14. This section was revised without substantive changes and recodified at 49 U.S.C. § 10741(a) (Supp. III 1979) by Pub.L.No. 95–473 § 4(b), 92 Stat. 1390 (1978).

*and conditions,* such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful.

49 U.S.C. § 2 (1976) (emphasis added). Section 3(1) of that Act provided prior to its revision and recodification: [15]

It shall be unlawful for any common carrier subject to the provisions of this chapter to *make, give, or cause any undue or unreasonable preference or advantage to any particular* person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, *in any respect whatsoever;* or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic *to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: Provided, however,* That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description.

49 U.S.C. § 3(1) (1976) (emphasis added). The interpretations of sections 2 and 3(1) were already well established by the time Congress incorporated the above provisions as the basis of section 202 of the Communications Act of 1934. In *Interstate Commerce Commission v. Baltimore & O.R. Co.,* 43 F. 37 (Cir.Ct.S.D.Ohio, 1890), *aff'd* 145 U.S. 263, 12 S.Ct. 844, 36 L.Ed. 699 (1893),[16] the Interstate Commerce Commission applied for an injunction to restrain the defendant railroad company from selling "party-rate" tickets which enabled parties of ten or more people to travel at a rate per capita that was lower than the rate charged a single passenger. The court held that the party-rate tickets were not in contravention of sections 2 and 3 of the Interstate Commerce Act and therefore refused to enforce the Commission's order against the railroad company. *Id.* at 55. In so holding, the court stated that

[sections 1, 2, 3 and 22] were intended to prohibit favoritism and partiality in traffic rates, where the circumstances and conditions were substantially similar and the service contemporaneous. *Persons in like situations, requiring or desiring like and contemporaneous service on the part of carriers, were to be treated, in the matter of rates, impartially.* This is expressed both affirmatively and negatively in the language of section 3. The carrier shall not give any undue or unreasonable preference or advantage to or in favor of any particular person, company, or traffic, nor subject any particular person, company, or traffic to any undue or unreasonable prejudice or disadvantage. *These words necessarily involve the idea or element of comparison of one service or traffic with another similarly situated and circumstanced, and require that, to be undue and unreasonable, the preference or prejudice must relate and have reference to competing parties, producing between them unfairness and an unjust inequality in the rates charged them respectively for contemporaneous service under substantially the same circumstances and conditions.* In determining the question whether rates give an undue preference or impose an undue prejudice or disadvantage, consideration must be had to the relation which the persons or traffic affected bear to each other and to the carrier. When and so long as their relations are similar or "substantially" so, the carrier is prohibited from dealing differently with them in the matter of charges for a like and contemporaneous

---

**15.** This section has been substantially revised but continues to prohibit unreasonable discrimination. It was recodified at 49 U.S.C. § 10741(b) (Supp. III 1979) by Pub.L.No. 95–473 § 4(b), 92 Stat. 1390 (1978).

**16.** This court in *American Trucking Associations, Inc. v. Federal Communications Commis-*

*sion,* 377 F.2d 121, 131 (D.C.Cir.1966), *cert. denied,* 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967), rejected the assertion by AT&T that this Supreme Court case stands for "the doctrine that volume discounts are permissible whenever offered to all people." That particular point is settled and is not raised here again.

service. *It thus appears that the intention of congress, as expressed in sections 1, 2, and 3, was to secure two leading objects, or effect two main purposes, viz.: First,* to establish, and impose upon railroad companies engaged in interstate commerce, the duty of conforming to the general rule of the common law in *making their charges for transportation services rendered reasonable and just; and, second, to prevent unjust inequality, partiality, favoritism, or unfairness, so far as concerned their charges for contemporaneous transportation services, as between persons, traffic, or localities similarly circumstanced.*

*Id.* at 47–48 (emphasis added).

The legislative history of the Communications Act of 1934 shows that the two main purposes of the Interstate Commerce Act were deliberately incorporated into the 1934 act. The first—requiring charges for communication services to be just and reasonable—is contained in section 201(b).[17]

The second objective—preventing unjust inequality or favoritism in the prices for communication services charged similarly situated customers—is contained in section 202(a) of the Act. The Senate Report on S. 3285, which became the basis of the 1934 act, expressly states that many of the provisions for the new act had been taken directly from the language of the Interstate Commerce Act:

In this bill many provisions are copied verbatim from the Interstate Commerce Act because they apply directly to communication companies doing a common carrier business, but in some paragraphs the language is simplified and clarified. *These variances or departures from the text of the Interstate Commerce Act are made for the purpose of clarification in their application to communications, rather than as a manifestation of congressional intent to attain a different objective.*

S.Rep.No.781, 73d Cong., 2d Sess. 2 (1934) (emphasis added).

The legislative history expresses Congress' intent to achieve the same objectives in the Communications Act of 1934 as it did in the Interstate Commerce Act. The prevailing judicial interpretation of the nondiscrimination language in the Interstate Commerce Act, at the time the new act was drafted, prohibited carriers from discrimi-

---

**17.** The Senate and House Reports state that section 201 was adapted from the language of sections 1(5) and 1(6) of the Interstate Commerce Act. Section 201(b) provides:

All charges, practices, classifications, and regulations for and in connection with such communication service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful: ....

47 U.S.C. § 201(b) (1976). A reading of sections 1(5) and 1(6) shows that the language of section 201(b) was derived from them. Section 1(5) provided prior to its revision and recodification:

All charges made for any service rendered or to be rendered in the transportation of passengers or property as aforesaid, or in connection therewith, *shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful.*

49 U.S.C. § 1(5) (1976) (emphasis added) (revised and recodified at 49 U.S.C. § 10701(a) (Supp. III 1979)).

Section 1(6) provided prior to its revision and recodification:

It is made the duty of all common carriers subject to the provisions of this chapter to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form, and substance of tickets, receipts, and bills of lading, the manner and method of presenting, marking, packing, and delivering property for transportation, the facilities for transportation, the carrying of personal, sample, and excess baggage, and all other matters relating to or connected with the receiving, handling, transporting, storing, and delivery of property subject to the provisions of this chapter which may be necessary or proper to secure the safe and prompt receipt, handling, transportation, and delivery of property subject to the provisions of this chapter upon just and reasonable terms, and *every unjust and unreasonable classification, regulation, and practice is prohibited and declared to be unlawful.*

49 U.S.C. § 1(6) (1976) (emphasis added) (revised and recodified at 49 U.S.C. § 10702 (Supp. III 1979)).

nating among customers who were seeking the same or substantially the same services. The word "service" included more than just the particular mode of transportation used, e.g., rail, water, or road; it also included factors of time, circumstances, and conditions. If Congress, in light of the prevailing judicial interpretation of that non-discriminatory treatment of customers provision, had wanted to change the meaning of the language it used in section 202(a), it was free to do so. It did not. The logical conclusion is that Congress intended section 202(a) to prohibit common carriers from unjustly or unreasonably discriminating among similarly situated customers in the prices charged for the same or substantially the same package of services.

The entire service package a customer purchases from a carrier should serve as the basis for making a likeness determination. Each component right, benefit, restriction, characteristic, or service provided by the carrier is relevant to the determination. Concededly, among the factors to be considered, transmission technology is the dominant one. But other factors to be considered *might properly include* operational characteristics, use restrictions, geographic limitations, service features, facilities, and customers' perceptions of the various services.

Other courts that have reviewed Commission likeness determinations under section 202(a) have specifically relied upon some of these factors. In *Western Union International, Inc. v. Federal Communications Commission*, 568 F.2d 1012, (2d Cir. 1977), cert. denied, 436 U.S. 944, 98 S.Ct. 2845, 56 L.Ed.2d 785 (1978), the Second Circuit reviewed a Commission decision which had concluded that no specific difference existed between the interconnection facilities provided international record carriers (i.e.

companies carrying messages overseas) and those provided under tariff to specialized common carriers and to domestic satellite common carriers. *Id.* at 1016. International record carriers (IRCs) are permitted by license to transmit and receive messages from and between five so-called "gateway cities," which are located at diverse points around the country. Once a message is received in a gateway city, it is transmitted by submarine cable or international satellite overseas. Circuits owned by AT&T connect one gateway operating center to another and also connect each center to entrance facilities, consisting of "cable heads" (for cable transmission) and "earth stations" (for satellite transmission). The circuits which connect the gateway operating centers and entrance facilities are referred to as "interconnection facilities" and are leased by AT&T to the IRCs. Domestic satellite common carriers and specialized common carriers which offer private line service [18] in competition with AT&T also were often required to use AT&T's landline interconnection facilities.

The Second Circuit affirmed the Commission's determination of likeness and its order directing AT&T to provide domestics with interconnection facilities based on standardized charges. In making the determination that the interconnection facilities used by the IRCs and the domestics were like services for purposes of section 202(a), the Commission looked to several factors besides whether the two groups were using the same AT&T circuits. The court noted that none of the comments filed in connection with the ratemaking proceeding cited "any explicit differences in physical facilities, functions, or costs of the two systems." [19] *Western Union, supra* at 1016. In addition, the court relied on the state-

18. Large volume customers frequently find it cost efficient to lease equipment and service which permit them to communicate between specified points whenever they desire without going through the usual call-and-hookup process.

19. On the question of discrimination, the court observed that the IRCs had raised for the first

time on review the argument that the difference in costs of the two systems justified the disparate treatment. The court dismissed the argument because it was not raised in the proceedings before the Commission and because the statement of an AT&T representative was to the contrary. *Western Union, supra* at 1019.

ment of an AT&T representative that "[e]ntrance and transiting facilities [for IRC's] are physically and essentially the same as those provided to domestic[s]." *Id.* at 1017. In light of the evidence showing the physical facilities, functions and costs of the two systems to be the same—and in the absence of any cogent arguments or concrete evidence to the contrary—the Commission obviously had no alternative but to conclude that the two services were alike.

In a second case, *American Trucking Associations, Inc. v. Federal Communications Commission*, 377 F.2d 121 (D.C.Cir.1966), *cert. denied*, 386 U.S. 943, 87 S.Ct. 973, 17 L.Ed.2d 874 (1967), this court upheld the Commission's determination that a new communications service called Telpak and private line service were like services under section 202(a). Telpak offered communications paths of various widths capable of transmitting electrical communication in various forms, including telephone, teletypewriter, facsimile and data. Four sizes of channels were offered by AT&T; it also provided channelizing equipment to subdivide Telpak channels or terminating equipment to convert the broadband transmission medium to its end use. A wide disparity existed between the proposed Telpak rates and those in effect for the same quantity of equipment and power under the private line services. In affirming the Commission's decision that the Telpak and private line services were alike, the court pointed out that regardless of whether a customer received Telpak or private line service, in each case AT&T supplied energizing electricity of the same sort and quantity, together with the same terminating equipment. *Id.* at 128. Particularly noteworthy to the court was

the fact that an undetermined number of private line customers switched to the new Telpak service and were given the new rates without any change whatever in the facilities they were being furnished. *Id.* Furthermore, the Commission found no material cost differences between furnishing a given number of circuits to a single customer under Telpak and furnishing circuits on a circuit by circuit basis to several customers. *Id.*

*American Trucking*, like *Western Union*, presented a fact situation in which the Commission and the courts had little trouble concluding that like services were being offered. In both cases the courts looked to factors beyond the actual transmission path used to ascertain whether like services existed. Additional factors considered included facilities, operational characteristics, competition, costs and use restrictions. *Id.* at 127–129. The Commission considered these additional factors presumably because it found them to be relevant in making its determination of likeness. If these additional factors were relevant ·and convincing then, in the absence of a Commission explanation as to changed circumstances, I fail to see why these same factors were asserted to have no relevance in the instant case.

The record here shows that information regarding these additional factors was presented to the Commission for its consideration. The Commission conceded in its brief on this petition for review that differences exist between WATS and Long Distance services as to facilities,[20] geographic limitation,[21] operator assistance services,[22] billing arrangements,[23] and business bene-

**20.** *"Facilities.* The facilities used for WATS differ from those used for Long Distance in these respects: WATS calls are blocked and screened, different accounting equipment is used, routing of calls is different in some instances, different forms of access line are used, and a special '800' telephone number is used for Inward WATS." Brief for Respondent at 29·30.

**21.** *"Geographic limitations.* A WATS subscriber pays for service to one of several geographical service areas defined in AT&T's tariff. Interstate Long Distance, on the other

hand, provides service throughout the United States and the so-called 'offshore' points, excluding the subscriber's own state." *Id.* at 32.

**22.** *"Operator assistance.* Long Distance offers operator assistance features while WATS does not." *Id.* at 32.

**23.** *"Billing arrangements.* The arrangements for billing Long Distance and WATS calls are different. Long Distance requires detailed information on each call (called number, time of call, duration of call, etc.) so the customer can

fits.[24] Nevertheless, the Commission disregarded these obviously different services because it felt that it could not allow distinctions between services which it perceived as only being related to price to "constrain its assessment of the services' communications functions." Brief for Respondent at 29.

The Commission continues to reevaluate the factors it will consider in making likeness determinations. It solicited comments in this case on the specific standards it should use in making likeness determinations. *Notice of Inquiry, supra* at 226. After reviewing the comments submitted, the Commission concluded that it should continue with a case-by-case approach rather than promulgate definite standards. *Like Services Decision, supra* at 613. It is clearly within the Commission's discretionary authority to proceed on a case-by-case basis. Furthermore, it is the domain of the Commission and not of this court to determine the factors upon which a likeness determination will be made and the weight to be assigned to each of those factors. *American Trucking, supra* at 131. However, the Commission in exercising its broad statutory discretion should be guided by the provisions of the Act which prohibit discrimination among similarly situated customers in the furnishing of like communication *services.*

I would hold that the Commission in making determinations of likeness under section 202(a) must evaluate the total service package purchased from a carrier, which includes the transmission path used as well as the facilities, operational characteristics, use restrictions and service features incidental to that communication transmission. In view of the Commission's own admissions in this case that it focused almost exclusively on transmission technology and thus largely disregarded material evidentiary comments and Commission data relating to facilities, operational characteristics, use re-

strictions, and service features incidental to transmission—and failed at the same time to give *proper* credit to customer perceptions, I conclude that, when the *proper* standard is applied, the action of the Commission was contrary to the weight of the evidence and was arbitrary and capricious. I would accordingly vacate and remand the Commission's decision for the reasons heretofore stated.

be billed for only those completed calls for which he or she is responsible. WATS requires only the number of calls and the total amount of time used." *Id.* at 35.

24. "*Business benefits.* Numerous commenters cited advantages to their businesses from using WATS." *Id.*